REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

JOSEPH L. CARPENTER,

     Plaintiff,

v.

MYSCHOOL.COM, an Internet Domain Name,

     Defendant.

Case no. 1:15cv212-JFA

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Attison L. Barnes, III (VA Bar No. 30458)
David E. Weslow (Pro Hac Vice)
Ari S. Meltzer (Pro Hac Vice)
Rebecca L. Saitta (VA Bar No. 65408)
Brian H. Pandya (VA Bar No. 72233)

WILEY REIN LLP
1776 K St. NW
Washington, DC 20006
(202) 719-7000 (phone)
(202) 719-7049 (fax)
abarnes@wileyrein.com
dweslow@wileyrein.com
rsaitta@wileyrein.com

Counsel for Defendant MYSCHOOL.COM

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...........................................................................1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................4

III.  SUMMARY JUDGMENT STANDARD............................................................9

IV.  PLAINTIFF CANNOT, AS A MATTER OF LAW, ESTABLISH THAT THE DEFENDANT DOMAIN NAME IS LIABLE FOR CYBERSQUATTING UNDER THE ACPA. ...............................................................................................9

      A.    Plaintiff Cannot Establish That the Registrant Had a Bad Faith Intent to Profit From the Purported Trademark...............................................................11

            1.    OWV Lacked Actual Knowledge of the Purported Mark When It Registered the Disputed Domain Name....................................................11

            2.    There is No Basis in the Law to Impute Knowledge of Plaintiff's Use or Registration of the MYSCHOOL Mark Upon the Registrant. ..............11

            3.    The Undisputed Material Facts Show that Registrant Could Not Have Had a Bad Faith Intent to Profit from Plaintiff's Mark. ...........................14

      B.    The Registration of the Defendant Domain Name is Protected Under the ACPA Safe Harbor. ...........................................................................17

      C.    OWV's Registration and Use of the Defendant Domain Name Constitutes Statutory Fair Use of Any Purported Trademark....................................................19

      D.    Plaintiff's Invalid Trademark Registration is Unenforceable and Should Be Cancelled.............................................................................................21

            1.    The Asserted Trademark Registration is Invalid. ......................................22

            2.    Plaintiff's Assertion of an Invalid Trademark Constitutes Trademark Misuse. ......................................................................................28

V.    DEFENDANT IS ENTITLED TO COSTS AND ATTORNEY'S FEES.........................28

VI.  CONCLUSION.............................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AIRFX.com v. AirFX LLC,*
  11-cv-01064-PHX-FJM, 2013 WL 857976 (D. Ariz. Mar. 7, 2013)......................................28

*Ale House Mangment, Inc. v. Raleigh Ale House, Inc.,*
  205 F.3d 137 (4th Cir. 2000) ....................................................................................................29

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)....................................................................................................................9

*In re Associated Theatre Clubs Co.,*
  9 U.S.P.Q. 2d 1660 (TTAB 1988) ............................................................................................20

*Avery v. Dennison Corp. v. Sumpton,*
  189 F.3d 868 (9th Cir. 1999) ....................................................................................................15

*Carolina Scenic Stages v. United States,*
  202 F. Supp. 919 (W.D.S.C. 1962)...........................................................................................19

*Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.,*
  89 F. Supp. 2d 464 (S.D.N.Y. 2000).........................................................................................18

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)....................................................................................................................9

*Dunn Computer Corp. v. Loudcloud, Inc.,*
  133 F. Supp. 2d 823 (E.D. Va. 2001) .......................................................................................28

*Ecker v. Atlantic Refining Co,*
  125 F. Supp. 605 (D. Md. 1954) *aff'd*, 222 F.2d 618 (4th Cir. 1955) .....................................19

*Edge Games, Inc. v. Electronic Arts, Inc.,*
  745 F. Supp. 2d 1101 (N.D. Cal. 2010),....................................................................................23

*Emergency One, Inc. v. American FireEagle, Ltd.,*
  228 F.3d 531 (4th Cir. 2000) ....................................................................................................25

*Ford Motor Co. v. Greatdomains.Com, Inc.,*
  177 F. Supp. 2d 635 (E.D. Mich. 2001)....................................................................................12

*George & Co. LLC v. Imagination Entertainment Ltd.,*
  575 F.3d 383 (4th Cir. 2009) ....................................................................................................25

iii

*Gioconda Law Group PLLC v. Kenzie*,
    941 F. Supp. 2d 424 (S.D.N.Y. 2013)....................................................................10

*IMAF, S.P.A. v. J.C. Penney Co.*,
    806 F. Supp. 449 (S.D.N.Y. 1992)........................................................................30

*Juno Online Services, L.P. v. Juno Lighting, Inc.*,
    979 F. Supp. 684 (N.D. Ill. 1997) .......................................................................28

*Lamparello v. Falwell*,
    420 F.3d 309 (4th Cir. 2005) ...........................................................................9, 15

*Marilyn Miglin Model Makeup, Inc. v. Jovan, Inc.*,
    No. 81C3233, 1984 WL 63128 (N.D. Ill. Dec. 7, 1984) .................................29, 30

*Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*,
    626 F.3d 958 (7th Cir. 2010) ..............................................................................29

*OBX–Stock, Inc. v. Bicast, Inc.*,
    558 F.3d 334 (4th Cir.2009) ...............................................................................21

*Orient Express Trading Co. v. Federated Dep't Stores, Inc.*,
    2 U.S.P.Q. 2d 1106 (S.D.N.Y. 1987), *modified in part, on recon.*, 3 U.S.P.Q. 2d 1387
    (S.D. N.Y 1987), *remanded*, 838 F.2d 1203 (2d Cir. 1987)...................................30

*Pizzeria Uno Corp. v. Temple*,
    747 F.2d 1522 (4th Cir. 1984) ............................................................................21

*Retail Services, Inc. v. Freebies Publishing*,
    364 F.3d 535 (4th Cir. 2004) ..............................................................................21

*Scotch Whisky Ass'n v. Majestic Distilling Co.*,
    958 F.2d 594 (4th Cir. 1992) ..............................................................................29

*Southern Grouts & Mortars, Inc. v. 3M Co.*,
    575 F.3d 1235 (11th Cir. 2009) ..........................................................................25

*Synergistic Int'l, LLC v. Korman*,
    470 F.3d 162 (4th Cir. 2006) ..............................................................................21

*Teal Bay Alliances, LLC v. Southern One, Inc.*
    No. MJG-13-2180, 2015 WL 401251 (D. Md. Jan. 26, 2015) .........................23, 27

*Tie Tech, Inc. v. Kinedyne Corp.*,
    296 F.3d 778 (9th Cir. 2002) ..............................................................................23

*Tober v. APROV.COM*,
    No. 1:07CV1252LMB/TCB, 2008 WL 4364221 (E.D. Va. Sept. 23, 2008) .........................25

*Ultimate Living International, Inc. v. Miracle Greens Supplements, Inc.*,
    No. 3:05-CV-1745-M, 2007 WL 14258 (N.D. Tex. Jan. 3, 2007) ........................................12

*Virtual Works, Inc. v. Volkswagen of America, Inc*.,
    238 F.3d 264, 267 (4th Cir. 2001) ........................................................................................13

*Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*,
    140 F. Supp. 2d 111 (D. Mass. 2001), *aff'd*, 259 F.3d 25. (1st Cir. 2001) ..............................30

**Statutes**

15 U.S.C. § 1051 ....................................................................................................................23

15 U.S.C. § 1057(b) ...............................................................................................................21

15 U.S.C. § 1115(b)(4) ...........................................................................................................20

15 U.S.C. § 1117(a) ...............................................................................................................28

15 U.S.C. § 1119 ....................................................................................................................28

15 U.S.C. § 1125(d)(1)(A) ........................................................................................................9

15 U.S.C. § 1125(d)(1)(A)(i) ...............................................................................................11, 12

15 U.S.C. § 1125(d)(1)(B) ......................................................................................................15

15 U.S.C. § 1125(d)(1)(B)(ii) ..................................................................................................17

15 U.S.C. § 1127 ....................................................................................................................31

**Federal Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................9

Fed. R. Civ. P. 56(e) ................................................................................................................9

**Legislative Materials**

145 Cong. Rec. S10515 (daily ed. Aug. 5, 1999) ......................................................................13

145 Cong. Rec. S10518 (daily ed. Aug. 5, 1999) ......................................................................13

H.R. Rep. No. 106-412 (1999) ................................................................................................13

S. 1255 (as reported by S. Comm. on the Judiciary July 29, 1999) .............................................13

S. Rep. No. 106-140 (1999) ....................................................................................................13

**Other Authorities**

2 McCarthy on Trademarks and Unfair Competition § 11:45 (4th ed.) ........................................20

5 McCarthy on Trademarks and Unfair Competition § 26:61 (4th ed.) ........................................15

Defendant myschool.com ("Defendant"), by counsel, submits this Memorandum of Law in Support of Its Motion for Summary Judgment. For the reasons set forth below, Defendant is entitled to judgment as a matter of law in its favor, to dismissal of Plaintiff's Complaint in its entirety, and to an award of fees and costs incurred.

## I.    PRELIMINARY STATEMENT

This case is not about cybersquatting or even alleged cybersquatting; instead, Plaintiff Joseph L. Carpenter ("Plaintiff") now concedes that he is pursuing this litigation to "keep running up [the registrant's] bills on purpose and make this the most expensive domain he will ever buy in his life." It is Plaintiff's desire to acquire the generic or descriptive MYSCHOOL.COM domain name at a price well below its value or, at the very least, to retaliate against the registrant for not selling the domain name at a bargain basement price.[1] This is not a proper use of a federal court in this country.

As if Plaintiff's motivation were not already clear from the pleadings and motions to date and Plaintiff's hiring and firing of at least four separate attorneys/firms to pursue his baseless claim against the MYSCHOOL.COM domain name, on September 2, 2015, Plaintiff posted the following to an Internet article about his pursuit of the MYSCHOOL.COM domain name:

> What's amazing is the fact that Yoni, the current owner, is willing to spend a half a million dollars or more to keep a domain name that isn't worth anything to anyone but me because, being the sole Trademark holder in the US, I'm the only one that would buy it – and that ain't going to happen now. I don't need the domain to be successful…lol. I could call it Schrap.com and it literally wouldn't matter! I would change the name before I paid for this domain. SAD for Yoni. . . . He can't sell the domain to anyone else because I'll just come after that buyer next and then he'll get sued by them for non-disclosure. So all he can do is sit on it and collect a small pay check each month for the next 30 years until he recovers

---

[1]   Plaintiff's counsel asked the registrant the following question in deposition: "if Mr. Carpenter walks in the room right now with $50,000, would you sell MySchool.com?" (to which the designee declined). See Transcript of Deposition of Yonatan Belousov (Aug. 14, 2015) ("Belousov Depo. Tr.") 143:3-6, attached hereto as **Exhibit A**.

1

half of what he's spending in attorneys fees. What a joke. I have nothing to lose even if I don't win the federal case because the counter claims were dropped because he's so scared of his personal assets getting taken when he loses. So I'll just keep running up his bills on purpose and make this the most expensive domain he will ever buy in his life. . . . And when I do win the case and he appeals it, I'll just keep on running up the bills. And if I don't, I'll just appeal it and keep running up his bills. I don't need an attorney anymore and I can better represent myself in this, especially with a jury involved so my costs are minor. It is literally the dumbest and most ignorant waste of money that I have ever seen in my life. Besides, I'm kinda enjoying learning the legal side of things :)

*See* Post by "JC" (Sept. 2, 2015, 1:13 p.m.), "Guy takes third stab at MySchool.com with lawsuit," Domain Name Wire, http://domainnamewire.com/2015/02/20/guy-takes-third-stab-at-myschool-com-with-lawsuit/, attached hereto as **Exhibit B**.[2]

As more fully set forth below, Plaintiff's case has no merit, and is nothing more than a personal vendetta. Plaintiff has previously lost **two** UDRP proceedings relating to the MYSCHOOL.COM domain name, with a combined six distinguished panelists of retired judges and practicing attorneys recognizing the generic or descriptive nature of the term "myschool" and the propriety of the registrant, Original Web Ventures Inc. ("OWV"), using the domain name to display a website based on the generic or descriptive meaning. More than just demonstrating the futile nature of Plaintiff's case, the two prior unanimous URDP decisions confirm the reasonableness of OWV's belief that it could lawfully acquire and own the MYSCHOOL.COM domain name without infringing upon Plaintiff's trademark rights.

Plaintiff cannot, as a matter of law, establish a *prima facie* case of cybersquatting under the ACPA. The undisputed material facts demonstrate that OWV did not learn about Plaintiff's

---

[2] In deposition, Plaintiff admitted that he previously used this name to post to this same site. *See* Transcript of Deposition of Joseph L. Carpenter (Aug. 13, 2015) ("Carpenter Depo. Tr.") 264:6-16, attached hereto as **Exhibit C**. The comment about firing his counsel pre-dated Plaintiff's counsel's notification to undersigned counsel that Carpenter wanted to appear *pro se*, and the comment includes information about a confidential settlement communication between counsel within the last week.

website or Plaintiff's trademark registration until September 2014—more than 18 months *after* it acquired the domain name at an arms-length auction.  OWV could not have acted with a bad faith intent to profit from a mark that it did not know exists, and a more detailed analysis under the statutory bad faith factors leads to the same result.

Moreover, OWV's use of the MYSCHOOL.COM domain name is protected both by the ACPA safe harbor and as a statutory fair use.  First, OWV had a reasonable belief that registration of the MYSCHOOL.COM domain name was lawful.  Plaintiff's purported trademark, which combines the generic words "my" and "school", is not a distinctive mark like Porsche or Verizon; rather, it is a weak mark based on a term that is a regular part of the American lexicon (*i.e.*, "I received a letter from my school"; "He attends my school"; "They sell them at my school.").  Thus, as the two UDRP panels have determined, even if the mark is suggestive *as to Plaintiff's services*, this does not provide Plaintiff with a monopoly over the use of the mark in any context.  Second, the undisputed material facts show that OWV has only used the domain name in connection with the descriptive meaning of the term "my school."

In fact, the only wrongful acts supported by the undisputed material facts were those of Plaintiff in procuring his registration of the asserted mark.  When submitting his statement of use to obtain his federal registration, Plaintiff: (1) falsely certified that he was using the mark in commerce in connection with all of the listed services, when there was limited to no commercial use of the asserted mark; and (2) submitted specimens that were altered prior to submission to the United States Patent and Trademark Office ("USPTO").  For these reasons, the Court should find that Plaintiff's MYSCHOOL mark invalid and cancel Plaintiff's trademark registration.

In light of the foregoing, this is an exceptional case for which the award of costs attorneys' fees is appropriate under the Lanham Act.  Through a combination of false assertions,

meritless claims, and use of the baseless claim as a form of extortion, Plaintiff has abused the legal process at OWV's expense.  Accordingly, the Court should grant summary judgment in Defendant's favor, cancel Plaintiff's purported MYSCHOOL mark, and award Defendant its costs and fees in defending against Plaintiff's frivolous allegations.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On March 22, 2007, Plaintiff filed U.S. Trademark Application Serial No. 77137273 for the MYSCHOOL mark specifying as a filing basis Section 1(b) (intent to use). MYSCHOOL00000313-318, attached hereto as **Exhibit D**.

2.      On July 9, 2007, the USPTO issued an Office Action refusing registration on the principal register because the mark was "merely descriptive" in that it "merely describes the services."  MYSCHOOL00000322-325, attached hereto as **Exhibit E**.

3.      On January 6, 2008, Plaintiff filed a response to the July 9, 2007 Office Action in which he acknowledged that "the term MYSCHOOL might have some attenuated meaning in relation to the services in question," but contended that the combined word mark is suggestive as to "Applicant's specific services."  MYSCHOOL00000327-334, attached hereto as **Exhibit F**.

4.      On November 18, 2008, Plaintiff ████████████████████████████████████
████████████████████████████████ PLAINTIFF00000881-882, attached hereto as **Exhibit G**.

5.      On November 30, 2008, Plaintiff ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ PLAINTIFF00000890-891, attached hereto as **Exhibit H**.

6.      On December 4, 2008, ████████████████████████████████████████
████████████████████████████████████████████████████████████
████ PLAINTIFF00000895, attached hereto as **Exhibit I**.

7.      On December 6, 2008, Plaintiff ████████████████████████████████████
████████████████████████████████████████████████ PLAINTIFF00000894, attached hereto as **Exhibit J**.

8.      Later on December 6, 2008, Plaintiff ████████████████████████████████
████████████████████████████████████████████████████████████
PLAINTIFF00000899, attached hereto as **Exhibit K**.

9.      On December 7, 2008, ████████████████████████████████████████

4

PLAINTIFF00000896-898, attached hereto as **Exhibit L**.

10.     On December 8, 2008, Plaintiff

PLAINTIFF00000896, attached hereto as **Exhibit M**.

11.     As of December 8, 2008, the site had between 20 and 30 users, about 10-15 of whom were helping to develop the site, with the remaining 10-15 "probably all connected to the 10 to 15 that were helping . . . build the site." Carpenter Depo. Tr. 123:20-124:16.

12.     On December 8, 2008, Plaintiff filed a Statement of Use for U.S. Trademark Application Serial No. 77137273 in which he declared under oath that that he "is using the mark in commerce or in connection with the goods/services identified" in the application:

- Advertising services, namely, advertising, promoting and offering information about the goods and services of others via a global communication network; providing a web site that enables users to post items for sale through on-line classified advertisements and messages.
- Communications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions; Electronic transmission of information, messages, data, sound, images and documents among users of computers; Providing on-line communications links which transfer the website user to other local and global web pages electronic transmission of data and documents among users of computers; providing access to databases via a global communication network.

MYSCHOOL00000361-365, attached hereto as **Exhibit N**.

13.     In support of his sworn statement of use, Plaintiff filed two specimens which featured the text "myschool.com" in the top left corner. MYSCHOOL00000366-367, attached hereto as **Exhibit O**.

14.     When asked why the text "myschool.com" appeared on the sworn specimens, Plaintiff stated:

4 I don't know, is this – Myschool.com, is
5 this something that the attorney typed in? Because
6 this isn't part of the screenshot. This is a
7 printed type – it's typed in not – not as part of
8 the site.
9 This was never on our site. This was
10 typed in as part of the page as submitted to the
11 thing. It's probably typed in by the attorney.
12 Q So you think the attorney added that,
13 "Myschool.com" –

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

14 A Yeah.

\*\*\*

5       And it's your position that the attorney
6 that prepared this typed "Myschool.com" on the –
7 on the pages that were submitted?
8 A Yeah. It's very obvious. They're not
9 part of the site. It's different printing, it's
10 different everything, so definitely added after.

Carpenter Depo. Tr. 108:4-19; 110:5-10.

15.     Although Plaintiff claims that the site provided advertising services through an iTunes link, an eCalculator link, and a banner ad for Bad Idea Magazine, Plaintiff never communicated with Apple, eCalculator, or Bad Idea regarding the ads that he displayed and never received a payment from any of those companies.  Carpenter Depo. Tr. 116:21-117:7; 119:2-18.

16.     Although Plaintiff claims that the site enabled users to post items for sale through a message board, Plaintiff has "no idea" who posted the three messages displayed on his specimen.  Carpenter Depo. Tr. 119:19-120:12.

17.     Plaintiff claims that the site provided "[C]ommunications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions" through the same "message boards, posts" as for the other services.  *See* Carpenter Depo. Tr. 121:9-15.

18.     On or about April 5, 2010, Plaintiff filed a UDRP complaint against a prior owner of the MYSCHOOL.COM domain name (the "Booth Complaint").  Pl.'s Response to Def.'s Req. for Admis. No. 1, attached hereto as **Exhibit P**.

19.     In a decision dated June 2, 2010 (the "Booth Decision"), a three member panel of the National Arbitration Forum denied the Booth Complaint.  Pl.'s Response to Def.'s Req. for Admis. No. 2, attached hereto as **Exhibit Q**.

20.     In the Booth Decision, the UDRP panel found that "the disputed domain  name is composed of the common, generic, words 'my' and 'school' and is being used to advertise products related to those words, namely educational products and services."  Pl.'s Response to Def.'s Req. for Admis. No. 4, attached hereto as **Exhibit R**; Pl.'s Response to Def.'s Req. for Admis. No. 113, attached hereto as **Exhibit S**.

21.     The Booth Decision included the statement: "Indeed, as noted above, the disputed domain name is comprised of common generic terms, which the Respondent was free to register and use."  Pl.'s Response to Def.'s Req. for Admis. No. 114, attached hereto as **Exhibit T**.

22.     The Booth Decision is publicly available. Pl.'s Response to Def.'s Req. for Admis. No. 115, attached hereto as **Exhibit U**.

23.     OWV became the registrant of the myschool.com domain name on or about March 1, 2013.  Pl.'s Response to Def.'s Interrogatory No. 29, attached hereto as **Exhibit V**.

24.     Prior to purchasing a domain name, OWV utilizes a combination of proprietary software and manual review to analyze more than 100 variables regarding the desirability and generic nature of the domain name.  Belousov Depo. Tr. 27:22-30:6.

25.     Before purchasing the myschool.com domain name, Yonatan Belousov, the owner and Chief Executive Officer of OWV, performed his usual due diligence to satisfy himself that the registration of the domain name would not violate any person's exclusive rights to the name. Belousov Depo. Tr. 49:9-50:7.

26.     Mr. Belousov did not become aware of Plaintiff's use of the term "myschool" until Plaintiff "brought a UDRP action against OWV" on September 4, 2014.  Def.'s Response to Interrogatory No. 14, attached hereto as **Exhibit W**; Belousov Depo. Tr. 52:6-52:14; 55:15-56:9.

27.     Mr. Belousov specifically selected the key words for the website associated with the MYSCHOOL.COM domain name so they are "descriptive to the domain."  Belousov Depo. Tr. 73:17-74:7.

28.     OWV has used the term "myschool" only in connection with its descriptive meaning.  Belousov Depo. Tr. 72:6-17.

29.     OWV makes approximately $700 a month from the descriptive information about schools and education that it provides on its site.  Belousov Depo. Tr. 105:1-3.

30.     OWV has received more than 200 inquiries regarding the purchase of the myschool.com domain name and has consistently either ignored these inquiries or quoted prices ranging from $250,000 to $700,000. Def.'s Response to Pl.'s Interrogatory No. 21, attached hereto as **Exhibit X**.

31.     On or about September 4, 2014, Plaintiff filed a second UDRP complaint against the MYSCHOOL.COM domain name (the "OWV UDRP Complaint").  Pl.'s Response to Def.'s Req. for Admis. No. 7, attached hereto as **Exhibit Y**.

32.     In a decision dated September 30, 2014 (the "OWV Decision"), a three member panel of the National Arbitration Forum denied the OWV UDRP Complaint.  Pl.'s Response to Def.'s Req. for Admis. No. 14 , attached hereto as **Exhibit Z**.

33.     The OWV Decision included the statement:  "Respondent has legitimately used the domain name for advertising related to the descriptive nature of the domain name itself." Pl.'s Response to Def.'s Req. for Admis. No. 120, attached hereto as **Exhibit AA**.

34.     The OWV Decision included the statement:  "Respondent's use of the domain name for advertising related to schools is an obvious and natural use to follow from the

<myschool.com> domain name. Such use evinces legitimate interest in the domain name." Pl.'s Response to Def.'s Req. for Admis. No. 121, attached hereto as **Exhibit AB**.

35.     In the OWV decision, the UDRP panel found that, "There is no persuasive evidence that Respondent registered and has used the domain name at issue in bad faith." Pl.'s Response to Def.'s Req. for Admis. No. 20; Pl.'s Response to Def.'s Req. for Admis. No. 122, attached hereto as **Exhibit AC**.

36.     The OWV Decision included the statement:   "Respondent's purchase of this <myschool.com> domain name is consistent with the legitimate practice of generic domain resale." Pl.'s Response to Def.'s Req. for Admis. No. 123, attached hereto as **Exhibit AD**.

37.     Plaintiff does not charge for the services offered in connection with the alleged trademark.  Pl.'s Response to Def.'s Interrogatory No. 4 ("Myschool does not currently charge for its products or services."), attached hereto as **Exhibit AE**.

38.     No advertiser has ever paid Plaintiff to advertise through Plaintiff's MYSCHOOL service.  Carpenter Depo. Tr. 119:2-18.

39.     None of the first ten results in a Google search for the term "myschool" on May 15, 2015 reflects goods or services offered by Plaintiff.  Pl.'s Response to Def.'s Req. for Admis. Nos. 140-41, attached hereto as **Exhibit AF**; Carpenter Depo. Tr. 217:2-7.

40.     None of the first ten results in a Google search for the term "myschool iTunes" on May 15, 2015 reflects goods or services offered by Plaintiff.  Pl.'s Response to Def.'s Req. for Admis. Nos. 145-46, attached hereto as **Exhibit AG**.

41.     None of the first ten results in a Google search for the term "myschool google play" on May 15, 2015 reflects goods or services offered by Plaintiff.  Pl.'s Response to Def.'s Req. for Admis. Nos. 149-50, attached hereto as **Exhibit AH**.

42.     Plaintiff is not aware of any instances of actual confusion between the myschool.com domain name and the services that Plaintiff offers in connection with the alleged trademark.  Pl.'s Response to Def.'s Interrogatory No. 8 ("Plaintiff is unaware of specific instances of documentable confusion."), attached hereto as **Exhibit AI**.

43.     Plaintiff was aware that the domain name myschool.com was not available for registration when he filed his application to register the purported MYSCHOOL mark.  Pl.'s Supplemental Response to Def.'s Interrogatory No. 7, attached hereto as **Exhibit AJ**.

44.     Plaintiff filed his complaint in this matter on February18, 2015.  ECF No. 1.

45.     Paragraph 11 of the complaint states: "The legally effective registration of[*sic*] date of the Disputed Domain is the date which it last sold or changed hands; which in this case, in[*sic*] 2014."  ECF No. 1 ¶ 11.

46.     Plaintiff now admits that "Original Web Ventures has been the owner of the domain name the whole time [since 2013]."  Carpenter Depo. Tr. 215:22-216:5; 221:9-222:10.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   A fact is material for purposes of summary judgment if, when applied to substantive law, it affects the outcome of the litigation.  *Anderson*, 477 U.S. at 248.   When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250 (quoting prior version of Fed. R. Civ. P. 56(e)).   The mere existence of some evidence to support the non-moving party is not sufficient; there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

## IV.   PLAINTIFF CANNOT, AS A MATTER OF LAW, ESTABLISH THAT THE DEFENDANT DOMAIN NAME IS LIABLE FOR CYBERSQUATTING UNDER THE ACPA.

To establish a *prima facie* case of cybersquatting under the ACPA, a plaintiff must prove that the registrant both: (i) has a bad faith intent to profit from the plaintiff's legitimate trademark; and (ii) registers, traffics in, or uses a domain name that is (a) identical or confusingly similar to a distinctive mark, (b) identical, confusingly similar to, or dilutive of a famous mark, or (c) one of an enumerated list of defined marks (inapplicable here).  *See* 15 U.S.C. § 1125(d)(1)(A).   Plaintiff faces numerous insurmountable barriers to establishing a *prima facie* case, such that summary disposition is appropriate.

As an initial matter, Plaintiff cannot establish that OWV acted with bad faith intent to profit from the trademark, which is fatal to Plaintiff's claim.   Establishing bad faith intent to profit is required for a successful claim under the ACPA.  *See, e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 320 (4th Cir. 2005) (explaining that bad faith intent to profit is "essential to a

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

successful cybersquatting claim"); *So. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1243 (11th Cir. 2009) (affirming grant of summary judgment where plaintiff "failed to show [defendant] had a 'bad faith intent to profit' as required by the statute"); *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 431 (S.D.N.Y. 2013) ("A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation.") (internal quotation omitted).   The undisputed facts demonstrate that OWV was unaware of Plaintiff's trademark when registering the domain name, and both the legislative history of the ACPA and common sense dictate that a party cannot have a bad faith intent to profit from a mark that it does not know exists.

Even if Plaintiff could somehow overcome this hurdle *without factual support*, he still cannot prevail as a matter of law.  The registration of MYSCHOOL.COM is protected by the ACPA's safe harbor because OWV, prior to registering the domain name, took numerous steps to assure itself that the registration and use of the domain name was lawful—the reasonableness of which has been confirmed by the two UDRP rulings.  Additionally, taking into consideration the weak nature of Plaintiff's purported mark, the registration and use of MYSCHOOL.COM based on the descriptive meaning of the term constitutes statutory fair use.

If these reasons were not enough, the trademark registration that serves as the foundation of Plaintiff's claims is invalid.  Plaintiff has admitted that specimens he submitted were altered prior to submission to the USPTO.  Carpenter Depo. Tr. 108: 4-19.  Moreover, Plaintiff provided a sworn declaration that he was using the mark in commerce for all of the services in his application when, in fact, he was not.  *See* **Ex. N.**  Accordingly, this Court should exercise its power to cancel Plaintiff's trademark registration and grant the instant summary judgment motion.

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

A.    **Plaintiff Cannot Establish That the Registrant Had a Bad Faith Intent to Profit From the Purported Trademark.**

The first element of a claim for cybersquatting under the ACPA is that the registrant "has a bad faith intent to profit from [the plaintiff's] mark."  15 U.S.C. § 1125(d)(1)(A)(i).  Here, the undisputed material facts demonstrate that OWV *did not* have actual knowledge of Plaintiff's purported trademark when it registered the domain name MYSCHOOL.COM.  Moreover, any attempt to convert the "bad faith intent to profit" standard from one of scienter to one of negligence must fail, as it contradicts both the plain language of the ACPA and its legislative history.

1.    OWV Lacked Actual Knowledge of the Purported Mark When It Registered the Disputed Domain Name.

The record is devoid of any facts showing that the registrant of the MYSCHOOL.COM domain name, OWV, knew of Plaintiff's purported trademark when it acquired the domain name through an arms-length auction in 2013.  Yonatan Belousov, the owner and Chief Executive Officer of OWV, did not become aware of Plaintiff's use of the term "myschool" until Plaintiff "brought a UDRP action against OWV" on September 4, 2014.  *See* **Ex. W**; Belousov Depo. Tr. 52:6-52:14.  Plaintiff has not produced any documents showing that OWV knew about Plaintiff's use of the term "myschool" before that date, nor has Plaintiff produced any documents showing that OWV knew that Plaintiff had registered the purported mark.  The undisputed facts, therefore, show that the registrant lacked actual knowledge of Plaintiff's obscure "use" of the purported MYSCHOOL mark when acquiring the MYSCHOOL.COM domain name.

2.    There is No Basis in the Law to Impute Knowledge of Plaintiff's Use or Registration of the MYSCHOOL Mark Upon the Registrant.

A party in the position of OWV, with no knowledge of a registered trademark, cannot, by definition, act with bad faith intent to profit from that mark, as neither the text of the ACPA nor

its legislative history support a "constructive bad faith" theory.  To ensure that the ACPA is not "trolled as dragnet, catching every small-fry Internet user whose domain name happens—in some small degree—to correspond with a protected trademark," the ACPA requires the owner of a trademark to prove that the domain name registrant had a "bad faith intent to profit <u>from that mark</u>."  15 U.S.C. § 1125(d)(1)(A)(i) (emphasis added); *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635, 643 (E.D. Mich. 2001).  The textual reference to "that mark" requires an intent to profit from a <u>particular</u> mark (i.e., the plaintiff's), and a registrant cannot intend to profit from a mark of which it has no knowledge.

The opinion of the U.S. District Court for the Northern District of Texas in *Ultimate Living Int'l, Inc. v. Miracle Greens Supplements, Inc.*, is particularly illustrative.  No. 3:05-CV-1745-M, 2007 WL 14258, at *7 (N.D. Tex. Jan. 3, 2007).  There, the facts before the court on summary judgment indicated that the domain name registrant became aware of the Plaintiff's mark <u>after</u> adopting the domain name.  *Id.* ("The only evidence before the Court regarding Ortiz's knowledge of the Green Miracle mark indicates she learned of it after adopting the domain name in 2001 and before her contact with Organic by Nature, Inc. in 2004.").  The court expressly rejected the notion that the registrant could have acted in bad faith based on constructive knowledge of the mark, finding that "[t]o prevail, [the trademark owner] must show that [the registrant] learned of the Green Miracle mark *before* adopting the domain name, a proposition unsupported by any record evidence advanced by" the trademark owner.  *Id.*  Like the defendant in *Ultimate Living*, OWV's lack of knowledge of the purported trademark when it registered the domain name establishes, as a matter of law, that it could not have acted with bad faith intent.  A grant of the instant motion is appropriate on this point alone.

This common sense interpretation of the term "bad faith intent" finds support in the

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

ACPA's legislative history.  Both the House and Senate Reports make clear that the ACPA is "narrowly tailored" and does not extend to registrations "by those who are unaware of another's use of the name."  H.R. Rep. No. 106-412, at 10 (1999); S. Rep. No. 106-140, at 12-13 (1999); *see also* 145 Cong. Rec. S10518 (daily ed. Aug. 5, 1999) (statement of S. Leahy).  Indeed, the ACPA does not extend "even to someone who is aware of the trademark status of the name but registers a domain name containing the mark for any reason other than with bad faith intent to profit from the goodwill associated with that mark."  H. Rep. No. 106-412, at 10; S. Rep. 106-140, at 13 (1999).  In short, Congress intended the ACPA to extend only to those with <u>actual knowledge</u> of the mark and the intent to profit off of that mark in bad faith.[3]

The approach found in the ACPA is the result of a conscious and calculated effort to "carefully balance the rights of trademark owners with the interests of Internet users."  145 Cong. Rec. S10515 (daily ed. Aug. 5, 1999) (statement of Sen. Hatch) (same).  The original version of the Senate bill provided for heightened civil penalties if the violation was "willful," and criminal penalties if the violation was "knowingly and fraudulently or in bad faith."  *See* S. 1255 at p.3, ln. 9-11; p.4, ln. 21-24 (as reported by S. Comm. on the Judiciary July 29, 1999).  Recognizing the substantial risk of overreaching inherent in the original approach, the Senate Judiciary Committee amended the bill to include the current bad-faith scienter requirement.  S.

---

[3] The implied knowledge requirement is consistent with the purpose of the act: curbing bad actors who "target distinctive" or "well-known marks," not those who unknowingly stumble upon a little-known mark.  *See* H.R. Rep. No. 106-412, at 13 ("The more distinctive or famous a mark has become, the more likely the owner of that mark is deserving of the relief available under this act."); S. Rep. No. 106-140, at 5-6; *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001) (citing H.R. Rep. No. 106-412, at 5-7).  For this reason, it is unsurprising that the examples of cybersquatting throughout the legislative history are well-known trademarks, such as Coca-Cola, Pepsi, Burger King, KFC, McDonalds, Subway, Taco Bell, Wendy's, BMW, Chrysler, Dodge, General Motors, Honda, Hyundai, Jaguar, Mazda, Mercedes, Nissan, Porsche, Rolls-Royce, Saab, Saturn, Toyota, and Volvo.  *See, e.g.*, S. Rep. No. 106-140, at 6.

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

Rep. at 8; S. 1255 at 11 (as reported by S. Comm. on the Judiciary July 29, 1999) ("Under the bill, as amended, the abusive conduct that is made actionable is appropriately limited just to bad-faith registrations and uses of others' marks by persons who seek to profit unfairly from the goodwill associated therewith.").   If the "bad faith" requirement were interpreted to extend to domain name registrations made with only *constructive* knowledge, it would re-raise the specter of harm to commerce that Congress specifically sought to avoid with this amendment.

In light of the straightforward text and clear legislative history, the Court should find that, as a matter of law, constructive knowledge cannot support bad faith intent and, therefore grant the instant motion for summary judgment.

> 3.   The Undisputed Material Facts Show that Registrant Could Not Have Had a Bad Faith Intent to Profit from Plaintiff's Mark.

There is nothing in the record to suggest that the registrant had "a bad faith intent to profit from that mark," as required to establish a *prima facie* case under the ACPA.  The statute provides nine nonexclusive factors for courts to consider when evaluating the bad faith standard:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site ... that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark ...;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used . . . the domain name in the bona fide offering of any goods or services . . . ;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name . . . ;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others . . . ; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous. . . .

15 U.S.C. § 1125(d)(1)(B).  The Court need not "simply count up which party has more factors in its favor after the evidence is in."  *Lamparello*, 420 F.3d 309, at 319 (internal quotation omitted).  Instead, the Court should use these factors as a guide "for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit."  *Id.*

When applying these factors, it is clear that the registrant of MYSCHOOL.COM did not act with a bad faith intent to profit.  Although OWV does not claim trademark rights in the MYSCHOOL.COM domain name and MYSCHOOL.COM is not OWV's legal name or a name commonly used to describe OWV, the inferences in favor of Plaintiff end there.  As Professor McCarthy has observed:

> Caution should be exercised, for the mere registration of multiple domain names for resale does not per se mark one as a cybersquatter. One may be in a justifiable business of reserving many domain names. For example, in one case defendant legitimately registered thousands of domain names for resale as "vanity" e-mail addresses which consisted of common surnames, names of hobbies, careers, pets, sports interests, and music. The fact that some of these resembled prominent trademarks did not make defendant a cybersquatter.

5 McCarthy on Trademarks and Unfair Competition § 25A:61 (4th ed.) (citing *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir. 1999).

With regard to the third and fourth factors, the undisputed facts show that OWV uses the domain name to offer links relating to the descriptive nature of the term "my school."  OWV specifically selected the key words for the website associated with the MYSCHOOL.COM domain name so they are "descriptive to the domain."  Belousov Depo. Tr. 73:17-74:7.  OWV

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

makes approximately $700 a month from the descriptive information about schools and education that it provides on its site. *See id.* 105:1-3. As explained below, this constitutes a fair use of the generic or descriptive term "myschool."

With regard to the fifth factor, OWV cannot and does not divert customers from Plaintiff's online location, as there is nothing to divert. Plaintiff's web site does not even appear in the first ten results of a Google search for the terms "myschool", "myschool itunes", or "myschool google play." *See* **Exs. AF-AH**; Carpenter Depo. Tr. 217:2-7 (admitting that a search engine search for Myschool will not return a listing for Plaintiff's site). Moreover, nothing in the record suggests that the services offered by OWV are the same as those in Plaintiff's registration.

As to OWV's efforts to sell the domain name, this is not a case where a registrant is merely trying to resell the domain name based on its trademark value. As explained above, OWV has made a bona fide use of the domain name based on the value of the descriptive term "myschool." Moreover, OWV has never reached out to Plaintiff trying to sell the site. OWV has received more than 200 inquiries regarding the purchase of the myschool.com domain name and has consistently either ignored these inquiries or quoted prices ranging from $250,000 to $700,000. *See* **Ex. X**.

There is no suggestion that OWV provided "material and misleading false contact information" when applying for the registration of the domain name or has made a practice of registering anything other than generic or descriptive domain names. When combining these factors with the fact that OWV did not know about Plaintiff's obscure website when it purchased the MYSCHOOL.COM domain name, OWV could not, as a matter of law, have had a bad faith intent to profit from Plaintiff's mark when it registered the MYSCHOOL.COM domain name.

Finally, as discussed in more detail in the discussion of statutory fair use, Plaintiff's mark

is not distinctive and should be considered a weak mark, if it is protectable at all.

**B.**     **The Registration of the Defendant Domain Name is Protected Under the ACPA Safe Harbor.**

Because OWV reasonably believed that registering the MYSCHOOL.COM domain name was lawful, there can be no finding of cybersquatting under the ACPA.  Under the ACPA's safe-harbor provision, "[b]ad faith intent ... shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  There are several reasons why OWV both "believed and had reasonable grounds to believe" that the use of the MYSCHOOL.COM domain name was a fair use or otherwise lawful.

First, prior to purchasing a domain name, OWV utilizes a combination of proprietary software and manual review to analyze more than 100 variables regarding the desirability and generic nature of the domain name.  Belousov Depo. Tr. 27:22-30:6.  Mr. Belousov performed his usual due diligence on the MYSCHOOL.COM domain name to satisfy himself that the registration of the domain name would not violate any person's exclusive rights to the name. Mr. Belousov testified:

> I look at a lot of variables and most of the variables were very, very favorable, which is not often you will see that.  So it had a lot of other websites using the phrase "my school". You know, so there was something like 3,000 domains at that point in existence just between com, net, and org that contained the key words "My School" in them.  Besides that, there are thousands of companies that call themselves either my school -- either something-my school or my school-something. When you search for it on the Google and Bing or, I guess, Google and, you know, besides that, there's just a lot of search volume for that key word, and the more interesting part was that even though this was an English phrase, it was actually surprisingly very worldwide.  So it seemed like different countries had something called my school-something.  It was incredible. Like if I'm looking for a domain to buy, this was it.

Belousov Depo. Tr. 49:9-50:7.

Second, the nature of the domain name at issue is such that a person would reasonably

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

believe that the use of the domain name for its generic or descriptive meaning was a fair use or otherwise lawful.  The United States District Court for the Southern District of New York addressed a similar issue in *Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464 (S.D.N.Y. 2000).  There the defendant registered the Internet domain name "cello.com" despite the fact that the plaintiffs had registered the trademark "cello" in connection with their high end audio equipment business two years prior.  *Id.* at 466.  In discussing the ACPA safe harbor, the court observed:

> This was not, for example, a situation where a cybersquatter registered "applecomputer.com" and then tried to extort Apple Computer into paying him money to release the domain name. Rather, the instant case is more akin to the situation where a person registers "apple.com" and then offers it to a number of parties that might be interested in the domain name. In fact, Storey approached at least nine other companies or individuals to offer them "cello.com."

*Id.* at 474.  Like "apple" and "cello", the phrase "my school" has generic or descriptive significance and, in fact, is used by numerous individuals and companies around the world—as evidenced by the fact that Plaintiff's website does not even appear on the first page of results for a search of the term "myschool".  Thus, it was reasonable for OWV to believe that its use of the MYSCHOOL.COM domain name was a fair use or otherwise lawful.

Finally, lest there be any doubt about the reasonableness of OWV's belief that its use of the MYSCHOOL.COM domain name was a fair use or otherwise lawful, two separate unanimous UDRP decisions reached this same conclusion.  OWV learned of the first decision, which involved a prior registrant of the domain name, on September 4, 2014—the day it received a notice of the second UDRP proceeding (but after it had registered the domain name).  *See* Belousov Depo. Tr. 55:15-56:9.  In that first decision, the UDRP panel found that "the disputed domain name is composed of the common, generic, words 'my' and 'school' and is being used to advertise products related to those words, namely educational products and services."  *See* **Exs.**

18

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

**R-S**.  The decision also stated: "Indeed, as noted above, the disputed domain name is comprised of common generic terms, which the Respondent was free to register and use."  **Ex. T**.  The second UDRP decision, to which OWV was a party, went even farther, declaring that:

- "Respondent has legitimately used the domain name for advertising related to the descriptive nature of the domain name itself."  **Ex. AA**;

- "Respondent's use of the domain name for advertising related to schools is an obvious and natural use to follow from the <myschool.com> domain name. Such use evinces legitimate interest in the domain name."  **Ex. AB**;

- "There is no persuasive evidence that Respondent registered and has used the domain name at issue in bad faith."  **Ex. AC**; and

- "Respondent's purchase of this <myschool.com> domain name is consistent with the legitimate practice of generic domain resale."  **Ex. AD**.

These decisions conclusively reaffirm the reasonableness of OWV's belief that its use of the "MYSCHOOL.COM" domain name was a fair use or otherwise lawful.  *Cf. Carolina Scenic Stages v. United States*, 202 F. Supp. 919, 924 (W.D.S.C. 1962) ("If it should ultimately be held that the Commission exceeded its authority in the rule-making proceeding, the decision could operate prospectively only, making unlawful further service dependent upon the Commission's ruling, but without making unlawful ab initio service earlier rendered in good faith reliance upon the validity of the Commission's order or the earlier Administrative Ruling."); *Ecker v. Atl. Ref. Co*, 125 F. Supp. 605, 612 (D. Md. 1954) ("actions taken by persons dealing with the Custodian in good faith upon reliance on Administrative Orders will be protected"), *aff'd,* 222 F.2d 618 (4th Cir. 1955).  Accordingly, as a matter of law, OWV's registration of the domain name falls within the protection afforded by the ACPA's safe harbor.

 **C.**  <u>OWV's Registration and Use of the Defendant Domain Name Constitutes Statutory Fair Use of Any Purported Trademark.</u>

In addition to qualifying for the specific safe harbor under the ACPA, OWV's registration and use of the MYSCHOOL.COM domain name also constitutes statutory fair use of

any purported MYSCHOOL mark.  Under the Lanham Act, a non-registrant junior user may use a registered trademark as long as it is a "use, otherwise than as a [trade or service] mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin."  15 U.S.C. § 1115(b)(4); *see also* 2 McCarthy on Trademarks and Unfair Competition § 11:45 (4th ed.) ("A junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark.").   As Professor McCarthy explains, "The only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created."  *Id.*

Here the words "my" and "school" are each generic words that, together, are at most descriptive.  Simply combining generic or descriptive terms does not remove their descriptive nature unless the combined term has a separate, non-descriptive meaning.  *See, e.g.*, *In re Associated Theatre Clubs Co.*, 9 U.S.P.Q. 2d 1660, 1662 (TTAB 1988).  As such, the USPTO originally refused Plaintiff's trademark application because "the combination of the descriptive words creates no incongruity, and no imagination is required to understand the nature of the goods and/or services."  *See* **Ex. E**.  In his response, Plaintiff acknowledged that "the term MYSCHOOL might have some attenuated meaning in relation to the services in question," but contended that the combined word mark is suggestive as to "Applicant's specific services."  *See* **Ex. F**.  Put another way, it was Plaintiff's view that although the term "myschool" may have a descriptive meaning, it is not descriptive as to the specific services in Plaintiff's application (*i.e.*, Plaintiff's obscure website).

The record is devoid of facts, however, showing that OWV's use of the combined words "my" and "school" in the MYSCHOOL.COM domain name relate to Plaintiff's "suggestive"

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

mark rather than the generic or descriptive meaning of the term.  Instead, contrary to his position in response to the Office Action, Plaintiff now contends that he owns the absolute right to the term "myschool" "for any type of advertising on the Internet."  *See* Carpenter Depo. Tr. 185:21-187:12.  However, it is well established that a suggestive mark is weak and "entitled to less protection from potential infringers."  *E.g.*, *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 173 (4th Cir. 2006).  Here, OWV has used the term "myschool" only in connection with its descriptive meaning.  *See* Belousov Depo. Tr. 72:6-17 ("[F]rom day one, because again, I want to make sure that I wouldn't be infringing on even common law marks, I made sure that all the links on [the site] are completely targeted to the descriptiveness of the name.").  Accordingly, the Court should find that OWV has made a fair use of any purported mark.

### D.      **Plaintiff's Invalid Trademark Registration is Unenforceable and Should Be Cancelled.**

As a final matter, Plaintiff's purported trademark registration is *void ab initio*, cannot serve as the basis of a valid claim under the ACPA, and should be ordered cancelled by the Court pursuant to 15 U.S.C. § 1119.  *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 549 (4th Cir. 2004) ("[A] a prerequisite for bringing a claim under the ACPA is establishing the existence of a valid trademark and ownership of that mark.").  Although the registration of Plaintiff's mark is *prima facie* evidence of its validity, this "does not shift the burden of persuasion on validity, merely the burden of production."  *OBX–Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 342 (4th Cir. 2009) (citing 15 U.S.C. 1057(b)).  "The presumption . . . does not preclude one charged with infringement from collaterally attack[ing] in an infringement action, either by way of an affirmative defense or by way of a counterclaim seeking cancellation of the registration."  *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984) (internal quotation marks omitted).  Plaintiff's registration is invalid as a matter of law for at least the following reasons:

(1) the specimens that Plaintiff submitted in support of his sworn statement of use were inauthentic and/or fabricated; and (2) Plaintiff failed to use the asserted trademark in commerce in association with all of the goods and services recited in the registration as of the dates of the sworn declaration. Plaintiff's assertion in this action of an invalid trademark constitutes trademark misuse and provides yet another basis for cancellation of Plaintiff's mark and a grant of the instant motion.

> 1.    The Asserted Trademark Registration is Invalid.

At the heart of Plaintiff's claim is the contention that Plaintiff has a valid trademark for the term MYSCHOOL. The asserted trademark, registration number 3,358,160, was initially filed as an intent to use application on March 22, 2007. *See* **Ex. A**. On December 8, 2008, Plaintiff filed a statement of use in which he declared, under oath, that he "is the owner of the mark sought to be registered, and is using the mark in commerce or in connection with the goods/services identified" in the application, which are as follows:

- Advertising services, namely, advertising, promoting and offering information about the goods and services of others via a global communication network; providing a web site that enables users to post items for sale through on-line classified advertisements and messages.

- Communications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions; Electronic transmission of information, messages, data, sound, images and documents among users of computers; Providing on-line communications links which transfer the website user to other local and global web pages electronic transmission of data and documents among users of computers; providing access to databases via a global communication network.

*See* **Ex. N**. In support of his statement of use, Plaintiff filed two specimens: (1) a printout of a message board showing two posts under the category of "sell"; and (2) a printout of a message board with the sub-categories "Alumni", "Sell", and "Sports & Athletics". *See* **Ex. O**.

> a.    Plaintiff Altered His Specimens of Use in Commerce Prior to

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

Submission.

Plaintiff acknowledges that he submitted, under oath, a specimen that was altered or otherwise inauthentic.  When applying for a trademark, the applicant must provide a sworn specimen of the mark as it is used in commerce. 15 U.S.C. § 1051.  If, however, the submitted specimen was fraudulently submitted, it would have the effect of stripping the registered mark of the presumption of validity.  *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1115 (N.D. Cal. 2010) (citing *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002)).  In *Edge Games*, the defendant provided evidence that the specimens submitted in support of Plaintiff's marks were inauthentic and "raise[d] serious questions regarding the veracity of" Plaintiff's sworn declaration.  745 F. Supp. 2d at 1108-13.  Based on that evidence, the court found that the plaintiff had not "demonstrated a likelihood of success in proving that the asserted marks are valid."  *Id.* at 1115.  Similarly, in *Teal Bay Alliances, LLC v. Southbound One, Inc.*, the plaintiff, after learning that its original specimen was insufficient, "placed an order with Vistaprint, an online supplier of print-on-demand products, for three sample t-shirts using the proffered 'Shorebilly' mark in the Polo and Izod fashion that the examiner had told him was illustrative of a proper trademark use."  No. MJG-13-2180, 2015 WL 401251, at *4 (D. Md. Jan. 26, 2015).  Because the specimen did not show use in commerce, the court cancelled the mark. *Id.* at *10.

Just as in *Edge Games* and *Teal Bay*, here specimens submitted by Plaintiff were inauthentic and raise serious questions about the veracity of the statements in Plaintiff's sworn declaration.  Specifically, specimens submitted with Plaintiff's sworn statement of use featured the text in the top left corner "myschool.com."  *See* **Ex. O**.  Of course, Plaintiff did not own the domain name MYSCHOOL.COM at the time, nor has he ever owned the domain name MYSCHOOL.COM.  When asked why, then, the text "myschool.com" appeared on the

23

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

specimens that he authenticated, Plaintiff stated:

> 4 I don't know, is this – Myschool.com, is
> 5 this something that the attorney typed in? Because
> 6 this isn't part of the screenshot. This is a
> 7 printed type – it's typed in not – not as part of
> 8 the site.
> 9 This was never on our site. This was
> 10 typed in as part of the page as submitted to the
> 11 thing. It's probably typed in by the attorney.
> 12 Q So you think the attorney added that,
> 13 "Myschool.com" –
> 14 A Yeah.

Carpenter Depo. Tr. 108:4-19.  The discussion continued:

> 5       And it's your position that the attorney
> 6 that prepared this typed "Myschool.com" on the –
> 7 on the pages that were submitted?
> 8 A Yeah. It's very obvious. They're not
> 9 part of the site. It's different printing, it's
> 10 different everything, so definitely added after.

Carpenter Depo. Tr. 110:5-10.

In short, Plaintiff has admitted that specimens that he submitted with his statement of use do not show "the mark as used in commerce" because they were modified prior to their submission to appear as if the specimens included actual use in commerce of "Myschool.com." For this reason alone, Plaintiff's trademark should be cancelled and the instant motion should be granted.

           b.      **Plaintiff Did Not Use the Asserted Trademark in Commerce in Association with All of the Goods and Services in the Registration as of the "First Use" Date.**

Notwithstanding Plaintiff's certification to the contrary, the undisputed facts demonstrate that Plaintiff was not using the MYSCHOOL mark in commerce in association with each good and service in Plaintiff's trademark application as of the date of his statement of use.  "[N]either promotional use of the mark on goods in a different course of trade nor mere token use constitute

24

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

'use' under the Lanham Act." *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). Rather, to obtain trademark priority, "the mark must be used to identify the source of the goods to potential customers." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009). Although the use of a mark on a website may prove sufficient, the "key is whether the designation claimed as a protectable mark has been used to make such a visual impression that the viewer would see it as a symbol of origin separate and apart from anything else." *Tober v. APROV.COM*, No. 1:07CV1252 (LMB/TCB), 2008 WL 4364221, at *2 (E.D. Va. Sept. 23, 2008) (quoting McCarthy on Trademarks and Unfair Competition § 7:17.50, at 7–38).

Here, Plaintiff's use of the mark on December 8, 2008, was nothing more than "token use" at best. In the lead up to December 8, 2008, Plaintiff was scrambling just to put a website online, much less use the mark in commerce. For example, on November 18, 2008—just 20 days before Plaintiff had to use the mark in commerce—Plaintiff ███████████████████ ██████████████████████████████████████████. *See* **Ex. G**. Then, on November 30, 2008, Plaintiff █████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

**Ex. H**.

This theme of ████████████████████████████ continued for the following week. On December 4, 2008, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████ **Ex. I**. Two days later, Plaintiff wrote: ██████████████████ ████████████████████████████████████████████████████████

25



**Ex. J**.  Later that day, Plaintiff

**Ex. K**.  On December 7, 2008,

*See* **Ex. L**. On December 8, 2008,

**Ex. M**.

In fact, by December 8, 2008, Plaintiff was not offering services in commerce in association with all of the goods and services recited in the registration.  With regard to "Advertising services, namely, advertising, promoting and offering information about the goods and services of others via a global communication network;" Plaintiff explains that: "There's an iTunes link. There was also eCalulator link, both to different sites. And this Bad Idea Magazine was a [link] to their site and a banner ad."  Carpenter Depo. Tr. 116:21-117:7.  However, these were nothing more than gratuitous links, not the offering of "advertising services" in connection with Plaintiff's mark.  In fact, Plaintiff never communicated with Apple, eCalculator, or Bad Idea regarding the ads that he displayed and never received a payment from any of those companies. *See id.* at 119:2-18.  For the same reason, Plaintiff's reliance on the same three links for providing "on-line communications links which transfer the website user to other local and global web pages electronic transmission of data and documents among users of computers" also is insufficient, as a matter of law, to establish valid use in commerce.

As to "enabl[ing] users to post items for sale through on-line classified advertisements and messages" and "provid[ing] a web site that enables users to post items for sale through on-

line classified advertisements and messages," the specimens submitted by Plaintiff showed nothing more than a message board with two threads – both involving "Dell." The three posts (for which Plaintiff cannot identify the identity of the posters) constitute nothing more than "token use." *See id.* at 119:20-120:12 (stating Plaintiff has "no idea" who could have posted the messages). It is clear that, as of December 8, 2008, Plaintiff was not using the MYSCHOOL mark to identify the source of a service for the posting of on-line classified advertisements and messages.

Meanwhile, Plaintiff was not making any use, token or otherwise, of the MYSCHOOL mark in connection with "[C]ommunications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions" as of the alleged date of first use. Plaintiff does not even claim to have offered "on-line chat rooms" on December 8, 2008, instead relying on the same "message boards, posts" as he has for the above services. *See* Carpenter Depo. Tr. 121:9-15.

Even if Plaintiff's actual uses corresponded to the services identified in his application (which they do not), such "sweet heart" use for developers and their close acquaintances does not constitute use in commerce. For trademark purposes, a use in commerce must include "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Thus, in *Teal Bay*, merely making "a few small sales to friends and family" and giving "away about 30 t-shirts at a community charity event" did not constitute use in commerce. 2015 WL 401251, at *12 n.27. Here, Plaintiff claims that he had between 20 and 30 users on December 8, 2008, about 10-15 of which were helping to develop the site, with the remaining 10-15 "probably all connected to the 10 to 15 that were helping . . . build the site."

27

Carpenter Depo. Tr. 123:20-124:16.  Such limited use by developers and their associates of a website that was ███████████████ cannot constitute bona fide use in commerce.

      2.     Plaintiff's Assertion of an Invalid Trademark Constitutes Trademark Misuse.

Plaintiff's attempt to preclude the use of the generic or descriptive term "myschool" on the basis of his invalid registration is an act of "unclean hands" and provides another basis for the Court to grant the present motion and to order cancellation of Plaintiff's mark.  Section 1119 of the Lanham Act provides the Court, in "any action involving a registered mark," with the authority to "determine the right to registration" and "order the cancellation of registrations."  15 U.S.C. § 1119.  Although trademark misuse is not an affirmative claim, this court and others have recognized that it is an appropriate defense to a claim of trademark infringement.  *See Dunn Computer Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 830 (E.D. Va. 2001); *Juno Online Servs., L.P. v. Juno Lighting, Inc.*, 979 F. Supp. 684, 685–87 (N.D. Ill. 1997).  Here, Plaintiff both submitted doctored specimens to the USPTO and falsely claimed under oath that he was "using the mark in commerce or in connection with the goods/services identified," when, in fact, he was not.  Accordingly, the Court should find that Plaintiff has misused his trademark, cannot maintain his trademark-based ACPA claim in this action, and order the cancellation of Plaintiff's trademark registration.

## V.     <u>DEFENDANT IS ENTITLED TO COSTS AND ATTORNEY'S FEES.</u>

A prevailing defendant is entitled to an award of costs and attorney's fees under the Lanham Act in exceptional cases.  15 U.S.C. § 1117(a).  Such an award is appropriate following entry of summary judgment for a prevailing defendant.  *See, e.g., AIRFX.com v. AirFX LLC*, 11-cv-01064-PHX-FJM, 2013 WL 857976, at *4 (D. Ariz. Mar. 7, 2013) (entering attorney's fee award to a prevailing domain name registrant following summary judgment ruling).

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

Although Plaintiff has acted in bad faith in asserting a baseless claim under the ACPA, and in the manner in which he has prosecuted the baseless claim, a finding that the plaintiff acted in bad faith is not required for a prevailing defendant to prove that the case is an exceptional case meriting an award of attorney's fees. *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992) ("[W]e believe that a finding of bad faith on the part of a plaintiff is not necessary for a prevailing defendant to prove an 'exceptional' case under section 35(a) of the Lanham Act."). Factors to be considered when assessing whether the case is "exceptional" include economic coercion, groundless arguments, and failure to cite controlling law. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000). The assertion of an objectively unreasonable claim is also sufficient to qualify as an exceptional case entitling the prevailing defendant to an award of attorney's fees. *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 965 (7th Cir. 2010) ("It should be enough to justify the award [of attorney fees] if the party seeking it can show that his opponent's claim or defense was objectively unreasonable.").

In the present case, there are a remarkable number of individual factors that have each been found in other cases to support an award of attorney's fees to prevailing defendants.

- The Complaint includes numerous material false assertions, including the date the domain name was acquired (ECF No. 1 ¶ 11; Carpenter Depo. Tr. 215:22-216:5; 221:9-222:10 (admitting that "Original Web Ventures has been the owner of the domain name [since 2013]")), and has not been amended. Defendant has been forced to defend such false assertions and to respond to numerous unfounded positions asserted by Plaintiff over the course of the litigation.[4] *Marilyn Miglin Model Makeup, Inc. v. Jovan, Inc.*, No.

---

[4] For example, Plaintiff's counsel provided a false certificate of service for Plaintiff's objections to Defendant's first discovery requests, requiring Defendant to prepare and file a Motion to Compel before Plaintiff ultimately agreed to a stipulated order. See ECF Nos. 21-22 (Motion to Compel), 31 (stipulated order). Plaintiff also filed a motion seeking to strike UDRP references from Defendant's Answer based on inapplicable rules of evidence (ECF Nos. 12-13), a motion to compel on discovery items for which he never sought to confer (ECF. Nos. 39, 41), a motion for a protective order in which Plaintiff attempted to re-litigate the Court's prior ruling relating to

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

81C3233, 1984 WL 63128, at *3 (N.D. Ill. Dec. 7, 1984) (awarding attorney's fees to prevailing defendant due to delay and confusion in the litigation because plaintiff's theory of its case "was never precisely articulated" and was "not susceptible to articulation").

- There is no evidence of the domain name registrant's actual knowledge of the trademark or of bad faith intent to profit, and the use of the domain name is clearly lawful. *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 140 F. Supp. 2d 111, 120-21 (D. Mass. 2001), *aff'd*, 259 F.3d 25 (1st Cir. 2001) (awarding attorney's fees to prevailing defendant where plaintiffs' claims were "unfounded" and "lacked any reasonable foundation.").

- Plaintiff has publicly stated his extortionate plans to force OWV to incur costs in defending his baseless claim. *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 965 (7th Cir. 2010) (Attorney's fees are available to prevailing defendant's where the claim is such that "a rational litigant would pursue only because it would impose disproportionate costs on his opponent—in other words only because it was extortionate in character if not necessarily in provable intention").

- The asserted trademark registration is invalid and unenforceable. *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 2 U.S.P.Q. 2d 1106 (S.D.N.Y. 1987), *modified, in part, on recons.*, 3 U.S.P.Q. 2d 1387 (S.D.N.Y. 1987), *remanded*, 838 F.2d 1203 (2d Cir. 1987).

- Mr. Carpenter has not sincerely attempted to establish OWV's bad faith intent to profit at the time of registration of the domain name. *IMAF, S.P.A. v. J.C. Penney Co.*, 806 F. Supp. 449 (S.D.N.Y. 1992), costs/fees proceeding, 810 F. Supp. 96 (S.D.N.Y. 1992).

If the Court grants this motion for summary judgment, and finds the case to be exceptional entitling Defendant to an award of attorney's fees, Defendant respectfully requests the opportunity to submit proof to the Court of the fees incurred to date in the litigation and, if deemed necessary by the Court, further briefing in the exceptional nature of the case.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should: (1) grant summary judgment in Defendant's favor; (2) cancel Plaintiff's purported MYSCHOOL mark; and (3) award Defendant its costs and fees in defending against Plaintiff's frivolous allegations.

---

the number of available discovery requests (ECF Nos. 43-45), a Motion for Judgment on the Pleadings or to Strike based solely on dicta from a single case that has been superseded (ECF No. 59-60), and an unnecessary Motion for Registry Lock and Injunction (ECF Nos. 72-74).

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

Dated: September 4, 2015        By:     /s/_____

                                        Attison L. Barnes, III (VA Bar No. 30458)
                                        David E. Weslow (Pro Hac Vice)
                                        Ari S. Meltzer (Pro Hac Vice)
                                        Rebecca L. Saitta (VA Bar No. 65408)
                                        Brian H. Pandya (VA Bar No. 72233)
                                        WILEY REIN LLP
                                        1776 K St. NW
                                        Washington, DC 20006
                                        (202) 719-7000 (phone)
                                        (202) 719-7049 (fax)
                                        abarnes@wileyrein.com
                                        dweslow@wileyrein.com
                                        rsaitta@wileyrein.com

                                        Counsel for Defendant MYSCHOOL.COM

REDACTED FOR PUBLIC INSPECTION
ORIGINAL FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2015, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorney of record for Plaintiff JOSEPH L. CARPENTER:

> David Ludwig
> Dunlap Bennett & Ludwig, PLLC
> 211 Church Street, SE
> Leesburg, VA 20175
> Email: dludwig@dbllawyers.com

> /s/ Attison L. Barnes /s/
> Attison L. Barnes, III (VA Bar No. 30458)
> WILEY REIN LLP
> 1776 K St. NW
> Washington, DC 20006
> (202) 719-7000 (phone)
> (202) 719-7049 (fax)
> abarnes@wileyrein.com

> *Counsel for Defendant MYSCHOOL.COM*