# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| JOSEPH L. CARPENTER, an individual; | ) ) |
|  | ) Case No.: 1:15-CV-212-AJT/JFA |
| Pl            aintiff, | ) |
| v. | ) |
|  | ) |
| <myschool.com>, a domain name; | ) |
|  | ) |
| Defendant. | ) |
|  | ) |
| _____ | ) |
|  | ) |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through hi s attorney, hereby opposes De fendant's Motion for Summ ary

Judgment filed September 4, 2015. [Dkt No. 122].

## TABLE OF CONTENTS

Page

1.0  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

2.0  RESPONSE TO DEFENDANT'S UNDISPUTED MATERIAL FACTS . . . . . . . .  2

3.0  PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED FACTS . . . . . . . . .  10

4.0  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    4.1  THE FINDINGS AND EVIDENCE FROM UDRP CASES ARE
    INADMISSIBLE AND ENTITLED TO NO DEFERENCE. . . . . . . . . . . . . . . . . .  14

    4.2  OWV HAS A HISTORY OF CYBERSQUATTING ON TRADEMARKED
    DOMAIN NAMES AND PLAINTIFF CAN SATISFY THE ACPA . . . . . . . . . . .  17

    4.3  DEFENDANT HAS A BAD FAITH INTENT TO PROFIT . . . . . . . . . . . . . . .  18

    4.4  PLAINTIFF'S MARK IS ENTITLED TO A PRESUMPTION OF
    VALIDITY AND DEFENDANT CANNOT ASSERT ITS DISMISSED
    COUNTERCLAIMS FOR INVALDITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    4.5 PLAINTIFF IS NOT REQUIRED TO AMEND THE COMPLAINT . . . . . . . .  23

    4.6  DEFENDANT IS NOT ENTITLED TO ATTORNEY FEES . . . . . . . . . . . . . .  23

5.0  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

## TABLE OF AUTHORITIES

Cases

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 2001 U.S. Dist. LEXIS 16057 at *5    22
(W.D. Va. Oct. 2, 2001)

*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 623    16
(4th Cir. 2003)

*Eurotech, Inc. v. Cosmos European TravelsAktiengesellschaft*, 213 F.Supp.2d 612, 617    16
(E.D.Va. 2002)

*Front Royal & Warren County Industrial Park Corp. v. Town of Front Royal,* 865 F.2d    22
77, 78 (4th Cir. Va. 1989)

*Hawes v. Network Solutions, Inc.*, 337 F.3d 377 (4th Cir. 2003)    17

*Harrods Ltd. v. Sixty Internet Domain Names,* 110 F. Supp. 2d 420 (E.D. Va. 2000)     20

*International Bancorp, L.L. C. v. Societe     Des Baines De Mer Et Du Cercle Des Etrangers A Monaco,* 192 F. Supp. 2d 467, 486 (E.D. Va. 2002).     16, 20

*March Madness Athletic Ass'n L.L.C. v. Netfire, Inc.,* 162 F. Supp. 2d 560, 573 (N.D. Tex. 2001)     18

*Retail Services v. Freebies Publishing*, 247 F.Supp.2d 822, 828 (E.D. Va. 2003)     16

*Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 27 (1st Cir. 2001)     16

*Lamparello v. Falwell,* 420 F.3d 309, 320 (4th Cir. 2005)     19

*PETA v. Doughney,* 263 F.3d 359, 370 (4th Cir. 2001)     24

*Sciolino v. City of Newport News,* No. 05-2229, 12 (4th Cir. 2007)(citing *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006)     23

*Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 599 (4th Cir.1991)     24

*Sport's Farm L.L.C. v. Sportsman's Market. Inc.,* 202 F.3d 489, 499 (2d Cir. 2000)     18

*Washington Metro. Area Transit Auth. v. Fleischman,* 1997 U.S. App. LEXIS 10560 (4th Cir. Md. May 8, 1997)     22

*Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. Va. 2001)     22

Statutes

16 U.S.C. § 1125(d)(2)(A)(i)     17
15 U.S.C. § 1125(d)(1)(B)(i)(V)     18
15 U.S.C. § 1125(d)(1)(B)(i)     19
15 U.S.C. § 1125(d)(1)(B)(i)(V), (VII) & (IX)     20
15 U.S.C. § 1064     22
15 U.S.C. § 1117(a)     24

Federal Rules

Rule 12(f)     22
Rule 15(a)     23

Other Authorities

Uniform Domain Name Resolution Policy (UDPR)

# 1.0     __INTRODUCTION__

After learning that Plaintiff's previous couns el of record David L udwig would seek to withdraw, Defendant filed th e present Motion for Summary Judgm ent with the Court on September 4, 2015. [Dkt No. 122]. Defendant's Mo tion contains a substantially expanded set of "undisputed facts" over those Defendant rep resented were u ndisputed in its W ritten Stipulation of Undisputed Facts filed on August 20, 2015 purs uant to the Court's order of March 18, 2015. [Dkt No. 108].

Essentially all of the Defendant's "undisputed  facts" in the present m otion are disputed, irrelevant, inadm issible, or contrarily esta blished by the evidence. Many are prem ised on unauthenticated evidence. Defendant contin ues to try and seek relief on its dism issed counterclaims. The present m otion was filed with this expanded  set of factual allegations in hopes Defendant would prevail by  default once David Ludwig's  withdrawal was approved and Plaintiff status as a litigant shifted to *pro se*.

Thirteen of  the f acts Def endant subm its as  ev idence are s imply findings from  UDRP decisions or a review of UDRP filings, which are  all inadmissible as evidence and entitled to no deference. Several f acts subm itted by Def endant ar e re levant only to  Def endant's dism issed counterclaims, and not the curren tly pending claims. Defendant's Motion is insufficient to grant summary judgment in Defendant's favor.

## 2.0    RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff responds to the undisputed m    aterial facts of Defendan    t/Registrant OW V as follows, specifying those facts Plaintiff agrees    are undisputed without    comment, and those he disputes with the evidence and explanation shown.

1.  On March 22, 2007, Plaintiff filed US Trademark Application Serial No. 77137273 for the MYSCHOOL Mark specifying as a filing basis Section l (b) (intent to use).
    **Response to 1**: Undisputed.

2.  On July 9, 2007, the USPTO issued an Office Action refusing registration on the principal register because the Mark was "merely descriptive" in that it "merely describes the services."
    **Response to 2**: Undisputed          and irrelevant.

3.  On January 6, 2008, Plaintiff filed a response to the July 9, 2007 Office Action in which he acknowledged that "the term MYSCHOOL might have some attenuated meaning in relation to the services in question," but contended that the combined word mark is suggestive as to "Applicant's specific services."
    **Response to 3**:          Disputed.  Although Plaintiff filed the office action response, nothing in Plaintiff's use of the word "might" establishes definitive admission or factual matter.

4.


7. 

11. As of December 8, 2008, the site had between 20 and 30 users, about 10 - 15 of whom were helping to develop the site, with the remaining 10-15 "probably all connected to the 10 to 15 that were helping ... build the site."
**Response to 11**:       Undisputed.  Plaintiff goes on to say he had "a couple thousand" users in his first year.  (Transcript of Deposition of Joseph L. Carpenter (August 13, 2015) ("Carpenter Depo. Tr.") 122:21 - 22, attached hereto as Exhibit C to Defendant's Memorandum in Support of Motion for Summary Judgment).

12. On December 8, 2008, Plaintiff filed a Statement of Use for US Trademark Application Serial No. 77137273 in which he declared under oath that that he "is using the mark in commerce or in connection with the goods/services identified" in the application:

• Advertising services, namely, advertising, promoting and offering information about the goods and services of others via a global communication network; providing a web site that enables users to post items for sale through on-line classified advertisements and messages.
• Communications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions; Electronic transmission of information, messages, data, sound, images and documents among users of computers; Providing on-line communications links which transfer the website user to other local and global web pages electronic transmission of data and documents among users of computers; providing access to databases via a global communication network.
**Response to 12**: Undisputed.

13. In support of his sworn statement of use, Plaintiff filed two specimens which featured the text "myschool.com" in the top left corner.
**Response to 13**: Undisputed.

14. When asked why the text "myschool.com" appeared on the sworn specimens, Plaintiff stated:

|    |    |
|----|----|
| 4  | I don' t know, is this - Myschool.com, is |
| 5  | this something that the attorney typed in? Because |
| 6  | this isn't part of the screenshot. This is a |
| 7  | printed type - it's typed in not - not as part of |
| 8  | the site. |
| 9  | This was never on our site. This was |
| 10 | typed in as part of the page as submitted to the |
| 11 | thing. It's probably typed in by the attorney. |
| 12 | Q So you think the attorney added that, |
| 13 | "Myschool.com" - |
| 14 | A Yeah. |

***

|    |    |
|----|----|
| 5  | And it's your position that the attorney |
| 6  | that prepared this typed "Myschool.com" on the – |
| 7  | on the pages that were submitted? |
| 8  | A Yeah. It's very obvious. They're not |
| 9  | part of the site. It's different printing, it's |
| 10 | different everything, so definitely added after. |

**Response to 14**:      Disputed (as out of context).  Plaintiff went on to say the text was probably put there by a web designer.  (Carpenter Depo. Tr. 107:14-20).  Plaintiff only speculated that the text "myschool.com" might have been added to the specimen.  The "myschool.com" text is irrelevant the use of the MYSCHOOL mark in commerce shown in the remainder of the specimen, the authenticity of which is not disputed.  The text could be labels from file number.  There are many explanations for its appearance in the margin of the specimen.

15. Although Plaintiff claims that the site provided advertising services through an iTunes link, an eCalculator link, and a banner ad for Bad Idea Magazine, Plaintiff never communicated with Apple, eCalculator, or Bad Idea regarding the ads that he displayed and never received a payment from any of those companies.
**Response to 15**: Undisputed.

16. Although Plaintiff claims that the site enabled users to post items for sale through a message board, Plaintiff has "no idea" who posted the three messages displayed on his specimen.

**Response to 16**:       Undisputed and irrelevant.  That Plaintiff does not know the identities of the posting parties is irrelevant.

17. Plaintiff claims that the site provided "[C]ommunications services, namely, providing on-line chat rooms and forums for transmission of messages, photographs, information and data among computer users in the field of general interest, including among alumni of various educational institutions" through the same "message boards, posts" as for the other services.
**Response to 17**: Undisputed.

18. On or about April 5, 2010, Plaintiff filed a UDRP complaint against a prior owner of the MYSCHOOL.COM domain name (the "Booth Complaint").
**Response to 18**:       Undisputed and irrelevant.  UDRP cases are inadmissible as evidence.

19. In a decision dated June 2, 2010 (the "Booth Decision"), a three member panel of the National Arbitration Forum denied the Booth Complaint.
**Response to 19**: Undisputed       and irrelevant.  The Booth UDRP Decision[1] found against Joseph Carpenter, not because he did not have trademark rights, but because the Disputed Domain in that case was registered before Joseph Carpenter accrued trademark rights, holding in the Findings:

> The previous owner of the disputed domain name had common law rights in the mark MYSCHOOL.COM.  The Complainant made a firm offer to purchase the disputed domain name from the previous owner, but it was sold to the Respondent for a higher price. The Respondent acquired the disputed domain name, and the associated common law rights, and uses the disputed domain name to provide advertising links to educational products and services.  The purchase agreement, dated December 2009, explicitly includes trademark rights associated with the domain name.

Booth Decision at 3.

20. In the Booth Decision, the UDRP panel found that "the disputed domain name is composed of the common, generic, words 'my' and 'school' and is being used to advertise products related to those words, namely educational products and services."
**Response to 20**:       Undisputed and inadmissible.  Findings of UDRP panels are inadmissible as evidence in federal court (argued below).

21. The Booth Decision included the statement: "Indeed, as noted above, the disputed domain name is comprised of common generic terms, which the Respondent was free to register and use."
**Response to 21**:       Undisputed and inadmissible.  Findings of UDRP panels are inadmissible as evidence in federal court (argued below).

---

[1] http://www.adrforum.com/domaindecisions/1319483.htm

22. The Booth Decision is publicly available.
   **Response to 22**: Undisputed and inadmissible. Findings of UDRP panels are inadmissible as evidence in federal court (argued below).

23. OWV became the registrant of the myschool.com domain name on or about March 1, 2013.
   **Response to 23**: Undisputed, however Plaintiff clarifies this is not necessarily the legally effective registration date.

24. Prior to purchasing a domain name, OWV utilizes a combination of proprietary software and manual review to analyze more than 100 variables regarding the desirability and generic nature of the domain name.
   **Response to 24**:



25. Before purchasing the myschool.com domain name, Yonatan Belousov, the owner and Chief Executive Officer of OWV, performed his usual due diligence to satisfy himself that the registration of the domain name would not violate any person's exclusive rights to the name.
   **Response to 25**:



26. Mr. Belousov did not become aware of Plaintiff's use of the term "myschool" until Plaintiff "brought a UDRP action against OWV" on September 4, 2014.
   **Response to 26**: Disputed.





27. Mr. Belousov specifically selected the key words for the website associated with the MYSCHOOL.COM domain name so they are "descriptive to the domain."
**Response to 27**:



28. OWV has used the term "myschool" only in connection with its descriptive meaning.
**Response to 28**:     Disputed.  (*See* Response to 27, supra).

29. OWV makes approximately $700 a month from the descriptive information about schools and education that it provides on its site.
**Response to 29**:     Disputed.  It is not disputed that OWV makes approximately $700/month from advertisements it provides on the Disputes Domain, but the advertisements OWV runs on the website to which the Disputed Domain resolves are to Plaintiff's competitors as shown in screenshots attached hereto as **Exhibit J**.

30. OWV has received more than 200 inquiries regarding the purchase of the myschool.com domain name and has consistently either ignored these inquiries or quoted prices ranging from $250,000 to $700,000.
**Response to 30**: Undisputed.

31. On or about September 4, 2014, Plaintiff filed a second UDRP complaint against the MYSCHOOL.COM domain name (the "OWV UDRP Complaint").
**Response to 31**:     Disputed and irrelevant.  OWV, not <myschool.com> was the named respondent.  UDRP decisions are inadmissible as evidence.

32. In a decision dated September 30, 2014 (the "OWV Decision"), a three member panel of the National Arbitration Forum denied the OWV UDRP Complaint.
**Response to 32**:     Undisputed and inadmissible.  Not admissible. UDRP decisions are inadmissible as evidence, and OWV made misrepresented false material facts in the

UDRP dispute, including that it had no actual notice of the Plaintiff's Mark. (*See* Response to 26, supra).

33. The OWV Decision included the statement: "Respondent has legitimately used the domain name for advertising related to the descriptive nature of the domain name itself."
**Response to 33**:        Undisputed and inadmissible.  Not admissible. UDRP decisions are inadmissible as evidence, and OWV made misrepresented false material facts in the UDRP dispute, including that it had no actual notice of the Plaintiff's Mark. (*See* Response to 26, supra).

34. The OWV Decision included the statement: "Respondent's use of the domain name for advertising related to schools is an obvious and natural use to follow from the <myschool.com> domain name. Such use evinces legitimate interest in the domain name."
**Response to 34**:        Undisputed and inadmissible.  Not admissible. UDRP decisions are inadmissible as evidence, and OWV made misrepresented false material facts in the UDRP dispute, including that it had no actual notice of the Plaintiff's Mark. (*See* Response to 26, supra).

35. In the OWV decision, the UDRP panel found that, "There is no persuasive evidence that Respondent registered and has used the domain name at issue in bad faith."
**Response to 35**:        Undisputed and inadmissible.  Not admissible. UDRP decisions are inadmissible as evidence, and OWV made misrepresented false material facts in the UDRP dispute, including that it had no actual notice of the Plaintiff's Mark. (*See* Response to 26, supra).

36. The OWV Decision included the statement: "Respondent's purchase of this <myschool.com> domain name is consistent with the legitimate practice of generic domain resale."
**Response to 36**:        Undisputed and inadmissible.  Not admissible. UDRP decisions are inadmissible as evidence, and OWV made misrepresented false material facts in the UDRP dispute, including that it had no actual notice of the Plaintiff's Mark. (*See* Response to 26, supra).

37. Plaintiff does not charge for the services offered in connection with the alleged trademark.
**Response to 37**:        Disputed.  Plaintiff has not charged for these services in the past.

38. No advertiser has ever paid Plaintiff to advertise through Plaintiff's MYSCHOOL service.
**Response to 38**:        Undisputed.  Irrelevant.

39. None of the first ten results in a Google search for the term "myschool" on May 15, 2015 reflects goods or services offered by Plaintiff.
**Response to 39**: Undisputed        and irrelevant.

40. None of the first ten results in a Google search for the term "myschool iTunes" on May 15, 2015 reflects goods or services offered by Plaintiff.
    **Response to 40**: Undisputed      and irrelevant.

41. None of the first ten results in a Google search for the term "myschool google play" on May 15, 2015 reflects goods or services offered by Plaintiff.
    **Response to 41**: Undisputed      and irrelevant.

42. Plaintiff is not aware of any instances of actual confusion between the myschool.com domain name and the services that Plaintiff offers in connection with the alleged trademark.
    **Response to 42**: Undisputed.

43. Plaintiff was aware that the domain name myschool.com was not available for registration when he filed his application to register the purported MYSCHOOL mark.
    **Response to 43**: Undisputed.

44. Plaintiff filed his complaint in this matter on February 18, 2015.
    **Response to 44**: Undisputed.

45. Paragraph 11 of the complaint states: "The legally effective registration of[*sic*] date of the Disputed Domain is the date which it last sold or changed hands; which in this case, in[*sic*] 2014."
    **Response to 45**:      Undisputed and irrelevant.  The legally effective registration date of the Disputed Domain may not be the date it was purchased.

46. Plaintiff now admits that "Original Web Ventures has been the owner of the domain name the whole time [since 2013]."
    **Response to 46**:      Undisputed and irrelevant.  The legally effective registration date of the Disputed Domain may not be the date it was purchased.

### 3.0    PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED FACTS

1. 

2. OWV is wholly owned by Yonatan Belousov, a resident of Canada, who makes his living primarily buying and selling these domain names as OWV's only employee.  (Belousov Depo. Tr. 8:12-17 and 15:2-10).



3.

4.

5.

6. Prior to the single UDRP dispute involving both the domain name underlying this proceeding <myschool.com> and OWV, OWV was named three times as the respondent/registrant is earlier UDRP cases by other trademark holders.  OWV was found to be cybersquatting in all of these previous UDRP cases and lost all three cases.  These cases include: *Grisoft, s.r.o. v. Original Web Ventures Inc.*, WIPO Case No. D2006-1381 (the "Grisoft Case"); and (ii) *ADAC e.V. v. Domain Administrator, Original Web Ventures Inc.*, WIPO Case No. D2013-0411 (the "ADAC Case"); and *Krea Icerik Hizmetleri Ve Produksiyon Anonim Sirketi v Domain Administrator / Original Web Ventures Inc.*, NAF Case No. 1489266 (the "Krea Icerik Case").  The decisions in these cases are attached hereto respectively as **Exhibit C[3], Exhibit D[4]** and **Exhibit E[5]**, and include: *Grisoft, s.r.o. v. Original Web Ventures Inc.*, WIPO Case No. D2006-1381; and

---

[2] This exhibit shows domain names sold by OWV in the last twelve months with corresponding US and Canadian trademarks in existence at the time these domains were sold.

[3] http://www.wipo.int/amc/en/domains/decisions/html/2006/d2006-1381.html

[4] http://www.wipo.int/amc/en/domains/search/text.jsp?case=D2013-0411 (holding "With respect to the PPC links, whilst such use may be permissible in relation to domain names which consist of common words and links where it is related to the generic meaning of the Domain Name and there is no capitalization on trade mark value, this is not the case here. The Respondent should have known that the Domain Name incorporates the Complainant's trade mark and the use of the Domain Name was unfair use resulting in misleading diversion. This shows a clear intention on the part of the Respondent to attract for commercial gain Internet users to the Website by creating a likelihood of confusion with the Complainant's mark as to the source, sponsorship, affiliation or endorsement of the Website. This amounts to bad faith under paragraph 4(b)(iv) of the Policy.")

[5] http://www.adrforum.com/domaindecisions/1489266.htm

---

(ii) ADAC e.V. v. *Domain Administrator, Original Web Ventures Inc.*, WIPO Case No. D2013-0411.  OWV was improperly named and later dismissed as the respondent in *Krea Icerik Hizmetleri Ve Produksiyon Anonim Sirketi v Domain Administrator / Original Web Ventures Inc.*, NAF Case No. 1489266.

7.  All three of these UDRP cases, the Grisoft Case, the ADAC Case, and the Krea Icerik Case, found that not only did OWV know it had registered domains that were trademarked, but that OWV was unlawfully benefiting from the diversion of traffic to websites with cost-per-click advertisements, as OWV is doing in the present case.  In all of these cases, OWV argued the domain were generic and demanded a finding of reverse domain name hijacking – just as OWV is in the present case.  *Id.*

8.  Not only do the Grisoft, ADAC, and Krea Icerik Cases demonstrate a familiarity with the UDRP process, ███████████████████████████████████████████████████████ ████████████████████████████████████████████ – all prior to the registration of the Disputed Domain.  (Belousov Depo. Tr. 40:10 and 41:14).

9.  In fact, the only UDRP case which OWV has won out of the four filed against OWV is the UDRP case filed by the Plaintiff which precipitated the present action before the Court.  (*See* Exhibit Z to OWV's Motion for Summary Judgment of September 4, 2015 [Dkt No. 122] (the "OWV Decision")).

10.  Having previously lost all three prior UDRP cases filed against it, in the Plaintiff's UDRP case against OWV, OWV simply chose to intentionally misrepresent material facts to the Panel, █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████

11.  The Booth Decision[6] found against Joseph Carpenter because the Disputed Domain in that case was registered before Joseph Carpenter accrued trademark rights, holding in the Findings:

> The previous owner of the disputed domain name had common law rights in the mark MYSCHOOL.COM.  The Complainant made a firm offer to purchase the disputed domain name from the previous owner, but it was sold to the Respondent for a higher price. The Respondent acquired the disputed domain name, and the associated common law rights, and uses the disputed domain name to provide advertising links to educational products and services.  The purchase agreement, dated December 2009, explicitly includes trademark rights associated with the domain name.

Booth Decision at 3.

---

[6] http://www.adrforum.com/domaindecisions/1319483.htm

Given these findings, the Booth Decision's justified Plaintiff's filing of the second UDRP case against OWV was because the registration date of the Disputed Domain had changed.



14. Based in part on this misrepresentation, OWV prevailed in the OWV UDRP Decision. The present case, filed in February of 2015, followed it.  OWV was not a party to the Booth UDRP case decided in June of 2010, which involved a different registrant, a different set of facts, and a different domain name registration date – and which Defendant claims to have known nothing about before commencement of this case. (Belousov Depo. Tr. 52:10 - 14).

15. In addition to making these intentional misrepresentations in the OWV UDRP Case, OWV's single officer and owner has been previously banned from one more other sites for "falsifying information & falsifying impressions" including <bannergomlm.com> as manifest by the screenshots attached hereto as **Exhibit G**.  (Declaration of Joseph Carpenter attached hereto as **Exhibit I** ("Carpenter Decl.") ¶ 7).

16. Neither UDRP decision involving <myschool.com> contained a reverse domain name hijacking finding on the part of Plaintiff.  (*Cf.* Booth Decision and OWV UDRP Decision).

17. After purchasing the Disputed Domain from Oliver Hoger in 2013, OWV transferred it between at least three different registrars and then changed the registrant of the Disputed Domain by putting the registration under a privacy guard in the Cayman Islands. (Belousov Depo. Tr. 82:18 – 84:5).

18. Plaintiff submits that the legally effective registration date of the Disputed Domain may not be the purchase date, but may be the date upon which OWV last changed the registrant, which Plaintiff believes to around September when OWV changed the registrant to privacy service, as alleged in the Complaint.  (Complaint ¶ 11).

19. The Plaintiff is the owner of a valid and subsisting US trademark in MYSCHOOL. (Carpenter Decl. ¶ 2; *See also* Record of Plaintiff's MYSCHOOL Trademark Registration (Reg. No. 3568160) (the "Mark") attached as **Exhibit H** hereto).  In addition to the actual notice OWV's emails manifest of the Mark, OWV had constructive notice of Plaintiff's trademark when purchasing the Disputed Domain in March of 2013, more than four years after the Mark issued.

20. All of Defendant's counterclaims were voluntarily dismissed from this action on June 30, 2015, including claims for trademark invalidity and trademark fraud.  [Dkt No. 67]. Despite this fact, OWV still argues in its motion for relief under the dismissed counterclaims, including requesting Plaintiff's trademark be cancelled and OWV be awarded fees for reverse domain name hijacking.

21. In its supporting memorandum [Dkt No. 123], Defendant incorrectly attributes a posting made in the comments section of an online article about the present to case to Plaintiff without evidence at http://domainnamewire.com/2015/02/20/guy-takes-third-stab-at-myschool-com-with-lawsuit/.  Upon information and belief, Plaintiff submits this comment was made by Plaintiff's cousin on a message board involving thirty-seven back-and-forth messages between different parties about the present case.  This message board includes comments which Plaintiff believes to have been authored by OWV, threatening to "bankrupt" the Plaintiff with the present case and ensure he's "living on welfare."  The comments by both sides constitute nothing more than venting of third-parties on a message board.  (Carpenter Decl. ¶ 5).

22. Although the text "myschool.com" does appear at the top of the specimen filed with Mark, this text was not relied on to show the mark being used in commerce in the specimen and was inadvertent.  (Carpenter Decl. ¶ 4; *See* Carpenter Depo. Tr. 264:6 - 16).

23. OWV does run advertisements for Plaintiff's competitors at the website to which the Disputed Domain resolves as shown in screenshots of the website at the Disputed Domain collectively attached as **Exhibit J** hereto.

## 4.0   ARGUMENT

### 4.1   THE FINDINGS AND EVIDENCE FROM UDRP CASES ARE INADMISSIBLE AND ENTITLED TO NO DEFERENCE.

At least thirteen of the f orty-six facts Defendant asserts  are m aterial and undisputed are simply findings from, or facts relating to, tw o UDRP cases; one filed in  2010, one filed in 2014. Only the latter of these two cases involved Original W eb Ventures (OWV) as a party, and OWV insists it had no knowledge of the first case, the Pl aintiff, or the Plain tiff's Mark un til after the second UDRP Case was filed (underm ining OWV insi stence that it was prejudiced by the first case).

OWV is no stranger to UDRP cas   es, having  lost all th ree previous UDRP cases f iled against it by other parties. P   laintiff has pr esented evidence above th at OWV made m aterial misrepresentations of material fact during   the UDRP case filed by Plai ntiff in 2014, including representing it had no actual notice of Plai            ntiff's MYSCHOOL Mark ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

All of the citations from    UDRP cases and evidence of UDRP cases relied upon by Defendant in its undisputed facts are inadm issible as evidence.  C ourts have uniform ly rejected anything other than de novo review of UDRP cas     es. F or exam ple, the Eastern District of Virginia early on rejected the argu    ment that  UDRP decisions were entitled to deference as "arbitrations." See *Parisi v. Netlearning, Inc.* , 139 F.Supp.2d 745 (E.D.Va.2001) at 747. In that case, like th e cas e a t ba r, th e plain tiff and  the def endant s ubmitted to  UDRP proceedings,  in which the panelists decided in favor of the defe ndant. *Parisi*, 139 F.Supp.2d at 748. The court found "the UDRP's unique contractua l arrangem ent renders . . . judi cial review of arbitration awards inapplicable." *Id.*, at 751. *Parisi* held that essentially, any reliance on the UDRP decision would be a grievous abuse of due process given the weakness of the UDRP system.  Because the

UDRP system does not provide for discovery, confrontation of witness, exclusion of inadmissible evidence or the ability to object to biased panelists, it fails the standards imposed by the U.S. Supreme Court to constitute an adequate arbitration process and must be disregarded. *Gilmer v. Interstate Johnson Lane Corp*., 500 U.S. 20, 30-34, 111 S.Ct. 1647, 1654-656, 114 L.Ed.2d 26 (1991).

The Fourth Circuit has dismissed the UDRP as "no more than an agreed-upon administration that is not given any deference under the ACPA." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona*, 330 F.3d 617 (4th Cir. 2003). The Barcelona court recognized that is was mandatory that the court ignore the UDRP, "because a UDRP decision is susceptible of being grounded on principles foreign or hostile to American law" *Id*. As a result, the ACPA explicitly authorizes reversing a panel decision if such a result is called for by application of the Lanham Act. In discussing the differences between the ACPA and the UDRP, one court observed that "[t]he remedies available in these fora differ, and the standards of liability, while similar, are not identical." *American Online Latino v. American Online, Inc*., 250 F. Supp.2d 351, 358-59 (S.D.N.Y. 2003) (citations omitted).

In a UDRP proceeding, the complainant must establish that the respondent's domain name is confusingly similar to the complainant's mark, that the respondent has no rights or legitimate interests in the domain name, and that the domain name has been registered and is being used in bad faith. UDRP ¶ 4(a). In order to prevail under the ACPA, the plaintiff must show that the defendant has a bad faith intent to profit from its use of plaintiff's mark and that it has registered, trafficked in or used a domain name that is a protected mark within the meaning of the statute. 15 U.S.C. § 1125(d)(1)(A). *Id.*, at 358 n. 38. 29.

There are no Rules of Evidence to contro l unreliable or otherwise inadmissible evidence and there is no requirem ent that docum ents be au thenticated or even sworn to under the UDRP. *See, e.g. Barcelona.com, Inc. v. Excelentis imo Ayuntamiento De Barcelona*, 330 F.3d 617, 623 (4th Cir. 2003) ("indeed, the W IPO [UDRP] panelist's decision is not even entitled to deference on the m erits"); *Eurotech, Inc. v. Cosmos Eur opean Travels Aktiengesellschaft*, 213 F.Supp.2d 612, 617 (E.D.Va. 2002) (Noting that a prior UDRP decision "is neither admissible, nor entitled to any def erence, with r espect to th e m erits issues pres ent in th is su it…[r]eview…must be de novo and independent of any" UDRP decision); *Retail Services v. Fr eebies Pub lishing*, 247 F.Supp.2d 822, 828 (E.D. Va. 2003)

("[d]ecisions m ade by arbitration panels unde r the UDRP are not afforded deference by the district court"); *Sallen v. Corinthians Licenciamentos LTDA* , 273 F.3d 14, 27 (1st Cir. 2001) ("the UDRP explic itly c ontemplates inde pendent review in national courts…."); *International Bancorp, L.L.C. v. Societe des Bains de Mer et du Cercle de s Estrangers a Monaco* , 192 F.Supp.2d 467, 475 n. 16 (E.D. Va. 2002) (noting "t hat the result reached in the W IPO proceeding is neither admissible nor entitled to a ny deference on the liab ility issues presented in this suit…[r]review…must be de novo and i ndependent of any WIPO panel conclusion"); *Storey v. Cello Holdings, L.L. C.*, 347 F.3d 370, 381 (2nd Cir. 2003) (" [u]nlike traditional binding arbitration p roceedings, UDRP pr oceedings are stru ctured speci fically to perm it th e dom ain-name registrant two bites at the apple"); *Id.*, at n.9 ("Although UDRP Pa ragraphs 4(a)-(c) establish th e substan tive elem ents that a co mplainant must prove to preva il in a UDRP administrative proceeding, the administrative panel' s consideration of thes e contractual criteria does not af fect the district court' s determ ination of whether Storey' s registration and use of 'cello.com' is lawful under the ACPA.") (Em phasis added); *Hawes v. Network Solutions, Inc.* ,

337 F.3d 377 (4th Cir. 2003) ("[A]djudication of an action brought under § 1114(2)(D)(v) on the heels of an administrative proceeding under Network Solutions' dispute resolution policy by the World Intellectual Property Organization or some other dispute resolution provider is independent of, and involves neither appellate-like review of nor deference to, the underlying proceeding."); *Eurotech*, 213 F. Supp. 2d 612, 617 (E.D. Va. 2002) (judicial review of World Intellectual Property Organization decision is de novo). Plaintiff's counsel is unaware of any final decision in any court expressing doubt that federal courts review UDRP proceedings de novo. Federal courts **do not consider any part of UDRP proceedings** and treat post-UDRP complaints as fresh proceedings. *Eurotech*, 213 F.Supp.2d at 617 (UDRP decision not admissible). The authority is unchallengeable that a UDRP decision is not evidence of the ultimate issue in the court and that it would be grave error for a court to rely upon such a decision.

For all of the foregoing reasons, this Court should disregard all references by Defendant to the previous UDRP cases involving <myschool.com>.

## 4.2 OWV HAS A HISTORY OF CYBERSQUATTING ON TRADEMARKED DOMAIN NAMES AND PLAINTIFF CAN SATISFY THE ACPA.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Just the constructive notice a party registering a domain name has of registered US trademarks is sufficient under the UDRP. The ACPA would be very shallow law indeed if all a defendant had to do to defeat was allege ignorance of an issued mark.

4.2.1        **Plaintiff Need Not Prove Bad Faith to Prevail.**

Contrary to the assertion of Defendant, Plaintiff need not prove bad faith to prevail in this *in rem* action. Bad faith is not required in       *in rem* cases. Instead, th e statu te affords relief where *"the domain name violates any* ▆▆▆▆▆▆ *owner of a mark* registered in the Patent and Trademark Office, *or protected under subsection (a) or (c)* ." 16 U.S.C. § 1125(d)(2)(A)(i) (emphasis added). Defendant OWV re lies to th e contrary o n i *n personam* cases, rather than in rem cases.[7]

In addition to having constructive notice of       the Plaintif f's Mark, it is   clear f rom the record that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Even if Plaintiff is required to prove bad faith, Plaintiff is this case can. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆

Given these facts, the on ly credible explanation for the registration and continued use of the Domain Name is that OW V sought to profit  from the Mark using cost-per-click ads on the site, which is bad faith under the  ACPA. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).  *See Sport's Farm L.L.C. v. Sportsman's Market. Inc.,*  202 F.3d 489, 499 (2d Cir. 2000)  (the best evidence of bad faith is taken from "the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress").

4.3    **DEFENDANT HAS A BAD FAITH INTENT TO PROFIT.**

---

[7] "[T]he b ill p rovides fo r in re m j urisdiction, wh ich allows a  mark o wner to seek th e fo rfeiture, can cellation,  or transfer of an infringing domain name by filing an in rem action against the name itself, *provided the domain name itself violates substantive Federal trademark law,* where the mark owner has satisfied the court that it  has exercised due diligence in trying to locate the owner of the domain name but is unable to do so... Allowing a trademark owner to proceed a gainst the dom ain names themselves . . . decreas es the need for tra demark owners to joi n the hunt to chase down and root out these dissidents or others seeking anonymity on the Net. The approach in the amended bill is a goo d compromise, whi ch provides meaningful protection to trademark ow ners whi le bala ncing the i nterest of privacy and anonymity on the Internet. Rep. No. 106-140, 1999 WL 594571 at **10-11 (1999) (emphasis added).

OWV adm its m aking $700 per m onth from cost -per-click advertisem ents it allow s a third-party to run on the website to which th e Disputed Dom ain < myschool.com> resolves. OWV's actions constitute a bad faith intent to profit from the Mark.

"A person acts in bad faith when using a dom ain that is identical, confusingly sim ilar to, or dilutive of a m ark that was dis tinctive or famous at the tim e it was registered, *regardless of what the person knew at the time of registra tion." March Madness Athletic Ass'n L.L.C. v. Netfire, Inc.,* 162 F. Supp. 2d 560, 573 (N.D. Tex. 2001) (emphasis added).

The ACPA includes a non-exhaustive list of factors a court may consider in assessing bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). The Fourth Circ uit has explained with regard to the listed factors:

> "[t]here is no simple formula for evaluating and weighing these factors. For example, courts do not simply count up which party has more factors in its favor after the evidence is in. In fact, because use of these listed factors is permissive, we need not ... march through them all in every case. The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit."

*Lamparello v. Falwell,* 420 F.3d 309, 320 (4th Cir. 2005) (internal citations and quotations omitted).

The factors that are particularly relevant to establishing "bad faith intent to profit" in this case include:

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; and
> ...
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

...
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section. <u>15 U.S.C. § 1125(d)(1)(B)(i)(V)</u>, (VII) & (IX).

A finding of "bad faith intent to profit" is appropriate under any or all of these factors against OWV. OWV is diverting consumers from the Plaintiff's site via search engines to a site where OWV gains commercially. OWV put the Disputed Domain under a privacy guard, lied about actual notice of the Mark, and has a patterns of bad previous conduct. *See e.g., Harrods Ltd. v. Sixty Internet Domain Names,* 110 F. Supp. 2d 420 (E.D. Va. 2000) ("Failure to keep one's address current or to leave an accurate forwarding address certainly casts doubt on the bona fides of a registrant. This fact coupled with the similarity of the offending mark may well be sufficient to enable a plaintiff facing a defaulting domain name to obtain an in rem judgment against the domain name."). It strains credibility for OWV to claim it put a privacy guard on the Disputed Domain to prevent spam , ███████████████████████████████ ████████████████████████████████████████████████████████

This Court has noted that: "[a]s intent is rarely discernable directly, it must typically be inferred from pertinent facts and circumstances." *International Bancorp, L.L. C. v. Societe Des Baines De Mer E t Du Ce rcle Des Etrangers A Monaco,* 192 F. Supp. 2d 467, 486 (E.D. Va. 2002).

Plaintiff's Mark is not unique in being comprises of two otherwise generic words. Many marks are, including MYSPACE ®, MYLIFE ®, MYSCORE ®, MYFAMILY ®, and even MICROSOFT®.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

Because of the misrepresentations OWV intentionally made to the UDRP panel, the three

previous lost UDRP cases,  and

and the fact that

, all means the ACPA's Safe Harbor provisions do not apply.

## 4.4   PLAINTIFF'S MARK IS ENTITLED TO A PRESUMPTION OF VALIDITY AND DEFENDANT CANNOT ASSERT ITS DISMISSED COUNTERCLAIMS FOR INVALDITY.

Plaintiff's registration for the MYSCHOOL mark is *prima facie* evidence of the validity

of the mark, of Plaintiff's ownership of the mark, and of Plaintiff's exclusive right to use the

mark in U.S. commerce.  Although the Defendant    could have asserted claims for invalidity or

cancelation of the Mark under the   Lanham Act as a result of fraud   or inherent descriptiveness,

the Defendant chose not to in this case.  After making those claims, the Defendant voluntarily

dismissed them to avoid subjecting itself to jurisdiction.  The  Defendant cannot now proceed as

if those counterclaims still stand.   All of      Defendant's arguments with relation to fraud,

descriptiveness, abandonment, cancelation or invalidity must simply be struck or disregarded in

light of the fact that Defendant itself waived any right to pursue them.

### 4.4.1   The Defendant's Affirmative Defenses Should Be Struck or Disregarded.

OWV has not appeared.  OWV refuses to subject itself to jurisdiction before the Court.

To prevent OWV from being subject to jurisdiction, OWV voluntarily dismissed all of its

counterclaims in this action.        Despite this fact, OWV continues to assert the dismissed

counterclaims and proceed as if entitled to    relief in a non-in rem action, including demanding

that Plaintiff's trademark be "cancelled" in the present motion and demanding attorney fees.

OWV's affirmative defenses should be struck or dismissed before trial, and OWV advised that injunctive relief, monetary relief, and other relief under the Lanham Act is not available to a registrant who has not submitted to jurisdiction.

Defendant's affirmative defenses are simply counterclaims restylized. Defendant seeks cancelation of Plaintiff's trademark as an affirmative defense under 15 U.S.C. §1064, based upon the "trademark misuse." This defense should also be dismissed, along with other challenging the validity of the Mark.

Moreover, permitting Defendants to further these defenses into trial would unnecessarily prolong the trial, confuse the jury/trier of fact, and waste valuable trial and court time on defenses which have no factual or legal support. The Fourth Circuit has held that "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. Va. 2001) (quoting 5A A. Charles Alan Wright et al., Federal Practice & Procedure § 1381, 665 (2d ed. 1990) and affirming the district court's grant of Plaintiff's motion to strike Defendants' "purported affirmative defense"). Further, a "court may 'strike defenses when they are clearly legally insufficient, such as when there is no bona fide issue of fact or law." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc*., 2001 U.S. Dist. LEXIS 16057 at *5 ( W.D. Va. Oct. 2, 2001) (quoting *Clark v. Milam*, 152 F.R.D. 66, 70 (S.D.W .Va 1993) (citation omitted)). See Rule 12(f); *see also Front Royal & Warren County Industrial Park Corp. v. Town of Front Royal,* 865 F.2d 77, 78 (4th Cir. Va . 1989) (affirming district court's grant of motion to strike defendants' absolute immunity defense); *Washington Metro. Area Transit Auth. v. Fleischman,* 1997 U.S. App. LEXIS 10560 (4th Cir. Md. May 8,

1997) (affirm ing district court' s grant of m otion to strike defense on   ground that it was not a

defense to a condemnation action).

4.5      **PLAINTIFF IS NOT REQUIRED TO AMEND THE COMPLAINT.**

The Plaintif f alleged in the Com plaint at paragraphs 9, 16,   20, 21, and 33 that OWV

registered in the Disputed Dom ain in contrave ntion of the ACPA without   specifying the date.

Only in paragraph 11 does Plain tiff allege, upon infor mation and belief, that the legally effective

registration date was in Septem ber of 2014, whi ch is the date Plaintiff believes OWV i  mposed

privacy guard on the Disputed Domain.

It is undisputed that OWV purchased the   Disputed Dom ain in March of 2013, however

this may not be the effective registration date.  Given that the Mark issued in 2009, it makes little

difference whether the Disputed Domain was registered in 2013 or 2014, and it is not necessary,

given the facts and allegations in the com plaint, for Pla intiff to am end the com plaint to a llege

2013 as the registration date.

If the Court disagrees, th e proper action by the C ourt would  be allow Pla intiff to am end

the Complaint.  Pursuant to Federal Rule of Civil Procedure 15, a part y may amend its pleading

by leave of court and "leave shall b e feely g iven when justice so requires."  Fed.R.Civ.P. 15(a).

As the Fourth Circuit Court of A ppeals recently explained, "[t]his lib eral rule giv es effect to the

federal policy in favor of resolving cases on        their m erits instead of disposing them        on

technicalities." *Sciolino v. City of Newport News,* No. 05-2229, 12 (4th Cir. 2007)(citing *Laber v.*

*Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (en banc)).[8]

4.6      **DEFENDANT IS NOT ENTITLED TO ATTORNEY FEES.**

---

[8] Accordingly, leave to amend should be  denied "only when the amendment would be  prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Id.*

This case f ollows a sing le lost UDRP case betw een the pa rties, which is entitled to   no deference in this Cour t.[9]  This fact d oes make the case "ex ceptional" nor entitle Defendant to attorney fees, particularly where Plaintiff be   lieves in good faith the Defendant m ade m aterial misrepresentations in the UDRP case, and the registrant OWV has refused to appear.

 Most          *in re m* ACPA cases in Vir   ginia f ollow lo st UDRP cases.    In fact, the UDRP specifically provides for litiga tion after UDRP.   By its p lain term s, the UDRP permits judic ial recourse before, during, and after a UDRP proceeding. Section 4(k) of the UDRP reads:

> Availability of Court Proceedings. The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding in concluded.

Therefore, it makes sense and would follow that a party who can opt to proceed in district court at any time during, after, or before a UDR P proceeding can obtain d e novo judicial review following the proceeding. *Parisi*, 139 F.Supp.2d at 747; *Sallen*, 273 F.3d at 26.

Durin *in personam*  claim s for trad emark infringem ent, a court m ay award reasonable attorney fees in "exceptional cases." According to 15 U.S.C. § 1117(a), a case is "exceptional" if the defendant' s conduct was "m   alicious, fraud ulent, willf ul or deliberate in    natu re." *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,*      958 F.2d 594, 599 (4th Cir.1991). In order to prevail under this standard, Plai ntiff must "show that the de fendant acted in bad faith."  *Id.; see also Texas Pig Stands v. Hard Rock Cafe Int'l, Inc.,*    951 F.2d 684, 697 (5th Cir.1992)(the ter m "exceptional" should be "interpreted by courts    to require a showing of    a high degree of culpability on the part of the infringer, for example, bad faith or fraud").

---

[9] Although there was an earlier UDRP case in 2010 involving the Disputed Domain, it did not involve the same parties, and OWV had asserted under penalty of perjury it had no knowledge of it.

Defendant's sole basis for claim ing attorney fees is the previously UDRP cases. As discussed above, all of Plain tiff's actions were m ade in good faith and under the reasonable belief that P laintiff has a legal r ight to the Dis puted Domain. The existence of Plaintiff's Mark which is identical to the Disputed Domain precludes a finding of bad faith here. It is important to note that a finding of bad faith under the ACPA cannot alone sust ain an award of attorney' s fees. *PETA v. Doughney,* 263 F.3d 359, 370 (4th Cir. 2001) (holding "a bad faith finding under the ACPA does not compel a finding of m alicious, fraudulent, willful or deliberate behavior under § 1117"). Thus, even if th is Court were to m ake a findi ng of bad faith under the ACPA, which, as discussed above, would be wholly unwarranted, such a finding would not itself warrant the award of attorney's fees under the Lanham Act. *See id.* Plaintiff must prove bad faith beyond the standard of the ACPA in order to prevail under § 1117 of the Lanham Act. *See id.*

Additionally, the only cases of which Plainti ff's counsel are aware which have awarded attorney fees in *in rem* cases, in which legal rem edies are unavailable, have been cases which have done so by default – and even then only to a Plaintiff which has actually appeared. Plaintiff is unaware of any cases awarding attorneys to a nonparty *in rem* which refuses to appear.

## 5.0   CONCLUSION

For all of the aforegoing reasons, Plaintiff submits that Defendant's Motion for Summary Judgment should be d enied. P laintiff additionally requests that th e Court identify those factual and legal matters it believes remain unresolved for trial.

DATED this the 2nd day of October, 2015.

/s/

Steven Rinehart (VSB No. 81,738)

*Counsel for Plaintiff*
110 S. Regent Street, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 456-9728
Fax: (801) 665-1292
Mobile: (801) 347-5173
Email: steve@uspatentlaw.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2015 a copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

/s/ Steven Rinehart
Steven Rinehart