1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
JOSEPH L. CARPENTER,          .      Civil Action No. 1:15cv212
an individual,                .
                              .
                Plaintiff,    .
                              .
     vs.                      .      Alexandria, Virginia
                              .      October 26, 2015
MYSCHOOL.COM, a domain name,  .      10:00 a.m.
                              .
                Defendant.    .
                              .
. . . . . . . . . . .         .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:            STEVEN RINEHART, ESQ.
                              110 S. Regent Street, Suite 200
                              Salt Lake City, UT 84111


FOR THE DEFENDANT:            ATTISON L. BARNES, III, ESQ.
                              DAVID E. WESLOW, ESQ.
                              Wiley Rein LLP
                              1776 K Street, N.W.
                              Washington, D.C. 20006


TRANSCRIBER:                  ANNELIESE J. THOMSON, RDR, CRR
                              U.S. District Court, Fifth Floor
                              401 Courthouse Square
                              Alexandria, VA 22314
                              (703)299-8595



(Pages 1 - 73)



(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

2

1          P R O C E E D I N G S

2          THE CLERK:  Joseph L. Carpenter v. MYSCHOOL.COM,

3  Civil Action No. 15cv212.

4          MR. BARNES:  Good morning, Your Honor.  Attison

5  Barnes on behalf of defendant.  With me today is David Weslow

6  of my firm.  He's been admitted pro hac vice, and he will argue

7  today.

8          THE COURT:  He's going to argue all the motions?

9          MR. BARNES:  He is, Your Honor.

10          THE COURT:  He's got a lot to argue.

11          MR. BARNES:  He's got a lot to argue, I know, but I

12  think he's up to it.

13          THE COURT:  All right.  Well, have you-all heard

14  anything from Mr. Carpenter's current counsel, Mr. Rinehart?

15          MR. BARNES:  We have not, Your Honor.  About the

16  hearing?  We have not.

17          THE COURT:  Yeah.  Have you-all had any conversations

18  with him the last week or so to --

19          MR. BARNES:  Not to discuss the hearing today other

20  than, obviously, there were some motions and papers filed.

21          THE COURT:  Okay.

22          MR. BARNES:  I didn't know if he was intending to

23  participate by phone.  I just assumed he was going to be here

24  today.

25          THE COURT:  Well, I was, too.  Well, we have -- I'll

1    tell you what my schedule was going to be.  I was going to take

2    up the motion to reopen discovery and the motion to seal

3    related to that motion and followed by the motion to file the

4    amended complaint, then take up the various motions to seal

5    that are related to the summary judgment pleadings, there are

6    six of those, and then hear the argument on motions for summary

7    judgment.

8              So, well, go ahead and have a seat.  I'll go ahead

9    and start in on the motions now.  The first motion that I'm

10   going to deal with is the motion to reopen discovery.  That is

11   docket No. 160.  In this motion, the plaintiff is asking the

12   Court to reopen discovery based on some information that they

13   claim came to light in the last day of discovery in the

14   deposition that was taken of the -- and how do you pronounce

15   his name?  I don't want to --

16             MR. WESLOW:  It's Belousov, Your Honor.

17             THE COURT:  Belousov?  Okay, Mr. Belousov.

18             Having reviewed the motion to reopen discovery and

19   having reviewed the opposition that was filed, it's clear to

20   the Court that as of June 1, in the answer to interrogatory

21   No. 14, that the plaintiff was aware of the timing in which the

22   defendant had indicated that the domain name was registered.

23   It also was provided with a copy of the e-mail that apparently

24   was the topic of conversation during the deposition.

25             Having found that there was more than sufficient time

4

1    to explore that during the discovery period, I'm going to deny

2    the motion to reopen discovery.

3            On the motion to seal, which is docket No. 162,

4    Mr. Weslow, I guess I should hear from you about that.  I'll

5    just give you a preview.  I've looked at a lot of these motions

6    to seal, and there may be one or two things that I think given

7    the nature of the pleadings that are in front of the Court that

8    will probably -- that I'll consider allowing to remain under

9    seal, but this, this is not one of them.

10           Is there anything in their memorandum that you think

11   meets the standard to remain under seal?  It's a fair amount

12   that they've, you know, they're talking about when you have

13   actual notice, the registered mark, talking about e-mails being

14   exchanged.  You've got this e-mail exchange, the deposition

15   testimony.

16           What, if anything, do you think should remain under

17   seal in their memorandum in support of their motion to reopen

18   discovery?

19           MR. WESLOW:  Your Honor, we believe that we can

20   permit the full pleading on the plaintiff's motion to reopen

21   discovery to be included in the record.

22           THE COURT:  Well, I do believe -- and we'll get more

23   into it in the pleadings having to do with the motion for

24   summary judgment -- but I think having reviewed those

25   pleadings, it is going to be appropriate to go ahead and have,

5

1   deny the motion to seal; that is, I'm going to deny the motion

2   to seal, it's No. 162.

3           What I'm going to do in ruling on that motion -- on

4   that motion, what -- I'm going to in the order direct the clerk

5   to unseal docket No. 166, which is the sealed version that was

6   filed.

7           So I'm denying the motion to reopen discovery that is

8   No. 160.  I'm denying the motion to seal the memorandum in

9   support of the reopen discovery, which is No. 162, and I'll be

10  asking that the Clerk's Office unseal docket entry 166, which

11  is the currently under seal sealed version of the motion to

12  reopen discovery.  Okay.

13          On the motion to file an amended complaint, other

14  than the back-and-forth as to, you know, they should have done

15  it sooner, what, if any, significance or prejudice do you see

16  in allowing the plaintiff to file the amended complaint?

17          MR. WESLOW:  Your Honor, we do not oppose the motion.

18  We just wanted to make the record clear that the plaintiff has

19  long known who the owner of the domain name was and that the

20  statements in the motion that plaintiff just acquired this

21  knowledge were, were not accurate.

22          THE COURT:  Okay.  And I, I fully understand that,

23  and that's fleshed out, I think, in the summary judgment

24  briefings pretty fully, so given -- and I think given the

25  current situation, what I'm going to do is I'm going to go

6

 1    ahead and grant the motion for leave to file the amended

 2    complaint, which is docket No. 157.  That's with the

 3    understanding that all of the -- I'm not going to require --

 4    that the same responses that you gave, that is, the answer to

 5    the initial complaint, will be deemed done to these -- to the

 6    amended complaint, and the same affirmative defenses that

 7    you've raised to the initial complaint will be deemed for the

 8    purposes of this hearing being made as to the amended

 9    complaint.  So that will take care of those two motions -- that

10    motion as well.

11            I'll take up the motions to seal, and there are three

12    motions to seal as to each of the motions for summary judgment.

13    Dealing with your motion for summary judgment first, the first

14    motion to seal is docket No. 125, which is the motion to seal

15    your memorandum in support of the motion for summary judgment,

16    which is requesting that various parts of the memorandum be

17    sealed and that Exhibits G through M be filed under seal.

18            Again, I've looked at what you have redacted.  I

19    think much of this has to do with the plaintiff's confidential

20    information, certainly the redactions on pages 4 and 5, I

21    believe, and redactions on page 25 and 26 as well.  Let me just

22    double -- 25 and 26 having to do with conversations with the

23    Web site developer and 28 as well and G through M.

24            As required by my scheduling order in the case, you

25    know, if you file a motion to seal and it's to seal someone

1   else's confidential information, they're obligated to come in

2   and try and explain to me why that information should remain

3   under seal.  They never filed anything in support or to provide

4   any real explanation as to why any of those things should be

5   filed under seal.

6        Do you want to say anything in support of the motion

7   to seal, or are you just filing it under seal because of their

8   desire to have it filed under seal?

9        MR. WESLOW:  That's correct, Your Honor.  And we had

10  previously asked plaintiff's counsel to de-designate, to remove

11  these designations, and they have declined.

12       THE COURT:  Okay.

13       MR. WESLOW:  We had filed the motion to seal solely

14  because of the plaintiff's designations.

15       THE COURT:  All right.  Well, I'm going to -- having

16  reviewed the materials that were filed under seal, I'm going

17  to -- and taking into consideration the Fourth Circuit's

18  standards in this having to do with a motion for summary

19  judgment, there needing to be a compelling governmental

20  interest to allow these materials to be filed under seal, I'm

21  going to deny the motion to seal, that is, docket No. 125.

22       On this one, having looked at the docket sheet, I'm

23  going to request that the Clerk's Office unseal docket entry

24  130, which is the memorandum.  It doesn't appear that -- or at

25  least I've been unable to locate Exhibits G through M.  130

1   doesn't have the exhibits attached to it, so I'm going to

2   request that you file a supplemental, just a notice of filing

3   and file Exhibits G through M in the public record, so that

4   will all be part of the public record.

5          Okay.  The next motion to seal is docket No. 136.

6   This has to do with plaintiff's motion to seal their opposition

7   to your motion for summary judgment, and in this one, they've

8   designated pretty significant amounts of materials, starting on

9   pages 4 and 5.  I guess those are again the material that you

10  had designated that I've now undesignated.

11         There is some information having to do with your --

12  the deposition testimony of your client beginning on pages 6

13  and 7, and then more information having to do with your

14  client's business on 10, 11, 12.  I believe that's it until we

15  get to the exhibits, or maybe page 17.  14, 17, 18, 20, and 21.

16         Let's talk about the memo first.  What, if anything,

17  in memorandum do you on behalf of your client think would need

18  to remain under seal?

19         MR. WESLOW:  Your Honor, we've, we've gone back

20  through the memorandum as well as the exhibits and believe in

21  terms of the documents that we had designated as being

22  confidential, all of these may be made available to the public.

23         THE COURT:  Okay.  The only one that I, I want to

24  just raise and make sure that you're, you and your client don't

25  have any issues with, I guess, is Exhibit A.  That's the

1    supplemental response to the interrogatories along with the

2    list of the domain names that have been sold from May 2014 to

3    April 2015.

4         You know, I, I assume some of this is public

5    information, some of it may not be public information, but I

6    take it your client is willing to allow those to be in the

7    public record; is that correct?

8         MR. WESLOW:  That's correct, Your Honor.

9         THE COURT:  Okay.  All right.  Excuse me, I'm sorry.

10   Go ahead and have a seat.  I'm going to have a conversation

11   with counsel here.

12        Now, you -- are you here on the Carpenter matter?

13        MR. RINEHART:  Yes, Your Honor.  I'm counsel for the

14   plaintiff.  I ran into some trouble with security.

15        THE COURT:  Well, come on up.

16        MR. RINEHART:  Okay.

17        THE COURT:  Note your appearance.

18        MR. RINEHART:  Your Honor, Steven Rinehart for the

19   plaintiff, Joseph Carpenter.

20        THE COURT:  Mr. Rinehart, it's 10:18.

21        MR. RINEHART:  Yes, Your Honor.

22        THE COURT:  Where have you been?

23        MR. RINEHART:  I was under the impression I could

24   bring a laptop through security.  I had to take it back.

25        THE COURT:  What, what would have given you that

1  impression, Mr. Rinehart?

2         MR. RINEHART:  Only because in other courts, I've

3  been able to do that, and I just didn't -- I wasn't familiar

4  with the rules.

5         THE COURT:  You're not familiar with the rules?  You

6  are a member of the bar of this Court.

7         MR. RINEHART:  Yes, Your Honor.

8         THE COURT:  As a member of the bar of this Court, you

9  need to be familiar with the rules of this Court.

10         MR. RINEHART:  I, I understand, Your Honor.

11         THE COURT:  And one of the rules of this Court is

12  when there's a hearing at 10:00, you be here at 10:00.  Do you

13  understand that?

14         MR. RINEHART:  Yes, Your Honor.

15         THE COURT:  All right.  So you tried to bring a

16  laptop in, and you couldn't bring a laptop in, so what did you

17  have to do then?

18         MR. RINEHART:  I took it back out to my car and then

19  came back through security.

20         THE COURT:  And that took 20 minutes to do?

21         MR. RINEHART:  No, Your Honor.  I, I got here about

22  five minutes late even on top of that.  Even before I got here

23  with the laptop, I was trying to get through traffic and came

24  in late last night on a -- on the plane.

25         THE COURT:  Well, just to try and get you up to speed

1    at this point as to what I have done starting as 10:00, with no

2    one here on behalf of the plaintiff, I've denied the motion to

3    reopen discovery.  I've granted the motion for leave to file

4    the amended complaint.

5           I've denied the motion to seal having to do with the

6    motion to reopen discovery.  I've denied the motion to seal

7    having to do with the memorandum in support of the -- I guess

8    I'm dealing with that now -- the defendant's memorandum in

9    support of its motion to compel -- no, its motion for summary

10   judgment, and I'm now dealing with your motion to seal the

11   opposition to the defendant's motion for summary judgment,

12   which I am denying, and will require that, that is -- you may

13   have a seat -- the motion to seal, it's docket No. 136, that is

14   the plaintiff's motion to seal the opposition to the

15   defendant's motion for summary judgment, I'm denying that

16   motion to seal and will ask that the Clerk's Office unseal

17   docket entry No. 149, which is the material that was previously

18   filed under seal.

19          The next motion to seal is docket No. 152.  This is

20   the motion to seal the reply and Exhibit A to the reply.

21   Mr. Weslow, any need to keep any of those materials filed under

22   seal?

23          MR. WESLOW:  Yes, Your Honor.  Exhibit A is a

24   confidential settlement agreement that arose following a

25   Canadian court litigation.  The settlement agreement's terms

12

1    require or specify that it may be privately shown but may not

2    be publicly disclosed or be the subject of any general public

3    release.

4              THE COURT:  Well, it appears to have been filed -- is

5    that, is that right? -- in the Superior Court in Ontario?

6              MR. WESLOW:  Yes, Your Honor.  I understand it was

7    filed under seal with that court as well.

8              THE COURT:  So I take it that the, the other party to

9    this agreement, your argument is that the other party to this

10   agreement would be prejudiced if it was being made known to the

11   public?

12             MR. WESLOW:  That's correct.

13             THE COURT:  Okay.  Mr. Rinehart, do you have any

14   argument on the motion to seal, that is, docket No. 152?

15             MR. RINEHART:  Your Honor, we haven't, we haven't

16   opposed the motion, but it's only out of respect to the

17   material that the defendant has designated confidential.  We

18   don't actually see any reason that the settlement agreement

19   should be designated confidential.

20             THE COURT:  All right.

21             MR. RINEHART:  And it contains only recitals on a

22   couple of agreements that purport to, to be extrajudicial

23   declarations about the UDRP case, Your Honor.

24             THE COURT:  Well, looking at what -- there's a

25   redaction on page 5 -- on, I believe, page 4 and a redaction on

1   page 15, both of which relate to the information that's set out

2   in Exhibit A.  Given that there is confidential information of

3   a third party in the encouragement of trying to resolve

4   disputes between the parties, I'm going to go ahead and grant

5   the motion to seal, that is, No. 152, and allow those portions

6   of the reply on pages 4 and 15 of Exhibit A to remain under

7   seal at this time.

8          Okay.  So motions to seal relating to the plaintiff's

9   cross-motion for summary judgment, we'll turn to them now.  The

10  first one is No. 144.  That's the motion to seal the memorandum

11  in support in Exhibits C, D, E, F, G, K, and O, I believe.

12  Mr. Rinehart, what --

13          MR. RINEHART:  Your Honor, all of these materials

14  were designated confidential or highly confidential by

15  defendant's counsel.

16          THE COURT:  All right.

17          MR. RINEHART:  It's out of respect for that

18  designation, we've redacted references to them in the

19  memorandum and the exhibits themselves, but we don't have any

20  objection to, to leaving them.

21          THE COURT:  Well, you didn't designate your

22  client's -- the defendant was the one who designated

23  Mr. Carpenter's deposition Confidential?

24          MR. RINEHART:  Yes, that's true, Your Honor.  Yes.

25          THE COURT:  You did or they did?

1        MR. RINEHART:  They designated that, that

2   Confidential in their summary judgment motion.

3        THE COURT:  Okay.  Well, I'll find out whether they

4   have any desire to keep any of this under seal.

5        Mr. Weslow?

6        MR. WESLOW:  Your Honor, with regard to Exhibit C,

7   which was the defendant's second responses to the request for

8   admissions, these were not marked Confidential, so we don't

9   believe that sealing is required.  Exhibit D was the full

10  transcript of Mr. Belousov's deposition.  There were portions

11  of the deposition that were marked, designated Confidential and

12  Highly Confidential, but the entire deposition was not marked

13  Confidential and Highly Confidential.

14       I don't believe the references that the -- excuse me,

15  I don't believe plaintiff's references are to the Confidential

16  or Highly Confidential sections, and therefore, it would seem

17  that a redacted version could be filed that could be placed on

18  the public record.

19       THE COURT:  Well, what -- I mean, I'll tell you I

20  read the entire transcript of both your client's and

21  Mr. Carpenter's depositions, so I'm, you know, at this point in

22  time, if anybody wanted to have a redacted version

23  supplemented, the time has come to do that.  You know, I, I

24  haven't -- if you can point out certain things that you think

25  you want to tell me why you think those should be, remain

1    confidential, I'm at a little bit of a loss as to that simply

2    for yours or Mr. Carpenter's, to be honest with you.

3         MR. WESLOW:  With regard to Mr. Carpenter's

4    deposition, no, Your Honor, those -- we're not aware of any

5    sections that need to be designated as confidential or withheld

6    from the public.  With regard to Mr. Belousov's deposition, we

7    can also agree that that can be made available to the public.

8         THE COURT:  I think some of these, like Exhibit F,

9    we've already dealt with, and one of the others, the same with

10   G, allowing them to be -- K.

11        MR. WESLOW:  K, Your Honor, was the e-mail from

12   Mr. Belousov to Mr. Booth.

13        THE COURT:  All right.

14        MR. WESLOW:  We had produced that.  We can agree to

15   have this included in the public record as well.

16        THE COURT:  Well, I'm at this point in time, I'm

17   going to go ahead and deny the motion to seal, that is,

18   No. 144, and request that the Clerk's Office unseal what is

19   docket No. 155.

20        That -- it -- well, that may not include the

21   deposition transcripts, but I -- at this point in time, I'm not

22   going to require them to be filed in the public record.  I'll

23   just go ahead and deny the motion to seal.

24        I think they may not have been added to docket No.

25   155 given the bulk of them, but at this point in time, I'm

1   going to deny the motion to seal 144 and request that the

2   Clerk's Office unseal what is currently docket entry No. 155.

3          The next is the motion to seal the opposition to

4   plaintiff's cross-motion for summary judgment.  That's No. 162,

5   having to do with the memorandum and Exhibit B, which I guess

6   I've already dealt with the Exhibit B part.  Is that correct,

7   Mr. Weslow?

8          MR. WESLOW:  Yes, it is, Your Honor.

9          THE COURT:  All right.  Then the only redaction on

10  that -- I believe the only redaction in that memorandum is on

11  page 4, which relates to the information in Exhibit B, so I'm

12  going to go ahead and grant the motion to seal No. 162, allow

13  that opposition to remain under seal.

14         Mr. Rinehart, I haven't seen your unredacted version

15  of the memorandum of your reply.  You, you filed electronically

16  a redacted version, what was it, Thursday night?  It that when

17  you filed?

18         MR. RINEHART:  It was Thursday night about midnight.

19         THE COURT:  And have you filed the unredacted version

20  yet?

21         MR. RINEHART:  I sent it to the Court, and it was

22  supposed to arrive today.  I have a copy here --

23         THE COURT:  Well, Mr. Rinehart, sending something to

24  the Court to arrive on the date of a hearing, help me

25  understand that.  Why do you think the Court would have had an

1  opportunity to review something that you're sending to the

2  Court by some messenger service or mail or some other delivery

3  service that is going to be getting here after the hearing has

4  started?

5          MR. RINEHART:  I tried to get it to the Court as

6  quickly as I could.  I have a copy here.

7          THE COURT:  Well, Mr. Rinehart, if you're a member of

8  the bar in the Eastern District of Virginia, you need to do

9  what it requires, and you should have had that filed the day

10  after that you filed it electronically.  You filed it

11  electronically on Thursday.  It should have been filed with the

12  Court on Friday and a copy delivered to me on Friday so that I

13  could have reviewed it before the hearing this morning at

14  10:00.

15          MR. RINEHART:  I understand, Your Honor.  There's

16  only one sentence that's redacted.

17          THE COURT:  I mean, I can guess what that is, but --

18          MR. RINEHART:  I can read into the record if you'd

19  like me --

20          THE COURT:  Well, it wouldn't really be appropriate

21  to read it into a public record if I'm trying to decide whether

22  it should remain under seal.  It relates to the exhibit that

23  I'm allowing to be filed under seal; is that correct?

24          MR. RINEHART:  To the, to the Canadian settlement

25  agreement, Your Honor.

```
 1           THE COURT:  Okay.  So I'm going to grant -- I'll go
 2    ahead and grant the motion to seal, that is, docket No. 177,
 3    and allow the -- I assume, I assume you will make sure that an
 4    unredacted version gets put into the public -- or gets filed
 5    with the Clerk's Office so it can have a docket entry --
 6           MR. RINEHART:  Yes.
 7           THE COURT:  -- so we can consider it, all right.
 8           So that deals with the motion to reopen discovery,
 9    the motion to file the amended -- and just so you know, on the
10    motion to file the amended complaint, I granted your motion to
11    file the amended complaint but with the caveat that all of the
12    responses that the defendant did to your original complaint
13    would be deemed done to the amended complaint, with the
14    understanding --
15           MR. RINEHART:  Yes, Your Honor.
16           THE COURT:  -- of the little changes that you did
17    there and the same affirmative defenses that they asserted in
18    the -- to the original complaint are being asserted -- deemed
19    asserted for the purposes of this argument today, without the
20    need to file any new answer or responsive pleading to the
21    amended complaint.
22           All right.  So now we're to the main event, which are
23    the two motions for summary judgment.  What, what I intend to
24    do is go ahead and allow the plaintiff to argue first, allow
25    the defendant to argue.  You know, the issues are so
```

1    interrelated, I don't think that it's going to make -- I'm

2    going to give each side two chances to argue.  I'll give the

3    plaintiff a chance to argue, defendant a chance to argue,

4    plaintiff a chance to argue, and the defendant a chance to

5    argue, okay?

6            So I'll go ahead and hear from you, Mr. Rinehart.

7            MR. RINEHART:  Thank you, Your Honor.  Your Honor, on

8    the plaintiff's motion for summary judgment, the plaintiff is,

9    it is obvious from the record, is the owner of a registered

10   trademark on the principal register.

11           THE COURT:  For certain goods and services.

12           MR. RINEHART:  It's a service mark, and it is in the,

13   on the expression "myschool," which is identical to the

14   disputed domain in this proceeding, of course.

15           Now, the motions touched a little bit on whether this

16   mark is descriptive or suggestive.  The mark denotes a school,

17   which is a tangible place, a building, an institution.  If my

18   client were in the business of selling schools or if they owned

19   a school, I would say that the mark would be more descriptive,

20   but my client is in the business of offering a service,

21   services that -- commentary for alumni of different schools, a

22   marketing service which is relating to schools.

23           The U.S. Patent & Trademark Office determined that

24   this mark was suggestive and thus inherently distinctive and --

25           THE COURT:  Well, that's only suggestive as to the

20

1    uses that it was, in its application, right?

2              MR. RINEHART:  That's right.

3              THE COURT:  Okay.  It's not that the mark is

4    suggestive as to all uses, only those uses set out in the

5    application.

6              MR. RINEHART:  That's, that's, that's accurate, Your

7    Honor.  However, I would point out that opposing counsel has

8    argued that it's descriptive even with respect to those

9    services, and so we might make some progress today if there was

10   some sort of understanding that it is suggestive with respect

11   to those services.

12             Now, the defendant is -- I mean, the plaintiff would

13   characterize them as a cybersquatter; they'd object to that

14   characterization; but they own, it's undisputed, over 50,000

15   domain names.  In the last 12 months, they've sold -- and I --

16   there is some confidential material that, that --

17             THE COURT:  Well, the only thing -- and just to get

18   you up to -- the only thing that is really confidential is the

19   explicit terms of the settlement agreement in Canada.

20             MR. RINEHART:  Okay.

21             THE COURT:  I don't think there's any -- and,

22   Mr. Weslow, am I wrong?  I think that's the only thing that

23   I'm -- I've allowed, that they own 50,000 domain names, that

24   they've sold 4 or 500 domain names in the last year.

25             MR. RINEHART:  Right.

1         THE COURT:  All of that information is now part of

2    the public record given the nature of this proceeding.

3         MR. RINEHART:  Okay.  Thank you, Your Honor.  The

4    amount of domain names they've sold over the last 12 months is

5    594.  I believe that's what the exhibits show.  We went through

6    and tried to look at how many of those domain names are

7    trademarked.  Keep in mind, none of the domain names are

8    actually being used in commerce.  They're all just sitting

9    on these -- the defendant is sitting on these domain names

10   and --

11        THE COURT:  Well, there are two different things:

12   sitting on them and using them to direct traffic somewhere else

13   is different.  I mean, I don't understand why you would say

14   that them making use of the domain name that generates $700 a

15   month income for them isn't use in commerce.

16        MR. RINEHART:  Well, use in commerce would be use in

17   connection with an offering of a good or service, and they're

18   resolving these domain names, each of them, to a generic

19   landing page.  The landing page is the same at every domain

20   name.  The only thing that differs from one domain name to the

21   other are the ads, the third-party ads that are shown on the

22   domain name.

23        And this is not use in commerce, the Trademark Office

24   wouldn't consider it to be use in commerce just to have a

25   generic landing page at the domain name.

1          And they generate, yes, cost-per-click or also called

2     pay-per-click revenue from the ads that are displayed on these

3     generic landing pages.  The ads that are displayed according to

4     the defendant in his deposition, they're, they're chosen via an

5     algorithm that he's hired a third party to use, so a third

6     party controls the placement of these ads on the domain, but he

7     registered these domains with the intent to benefit from the

8     traffic in these expressions, with the intent to sell these

9     domain names, keeping in mind that 144 of the last 594 he sold

10    are trademarked to benefit from the sale of these to other

11    parties.

12         Now, the Fourth Circuit's held, even this Court's

13    held that it's hard to prove intent, but we have evidence here

14    that, I think, proves it.  We have a history of cybersquatting

15    on the part of the defendant.  There's some dispute over

16    whether he's lost one UDRP case or three UDRP cases prior to

17    this, but I hope that the memorandum made it clear that he's

18    lost three, which are all three that were filed except the one

19    that preceded this case.  He's been banned, the evidence shows,

20    from other Web sites for committing fraud to falsifying

21    impressions.

22         Now, this is just the evidence that we have, that

23    we've tried to attach to show intent.

24         THE COURT:  What, what does this eight or nine years

25    ago, that he was somehow or another, you know, banned from the

23

1   Internet, your argument, have to do with cybersquatting?

2          MR. RINEHART:  Well, we're trying to show intent.

3   We're trying to show bad faith intent and establish --

4          THE COURT:  So you don't think filing serial UDRP

5   proceedings could show bad faith intent?

6          MR. RINEHART:  You mean on the part of the plaintiff?

7          THE COURT:  Yeah.

8          MR. RINEHART:  No, Your Honor.

9          THE COURT:  Okay.

10          MR. RINEHART:  The UDRP cases are entitled to no

11   deference, and there were two UDRP cases that preceded this

12   case.  One was in 2010; one was in 2014.  The first did not

13   involve the current registrant.

14          THE COURT:  No, but it involved the same domain name.

15          MR. RINEHART:  Well, it did involve the same domain

16   name, but the ruling in that case was against the complainant

17   because the domain had been registered before he accrued

18   trademark rights.

19          In the second case, the domain was registered clearly

20   after he accrued trademark rights, and so there was every

21   justification in the world for filing the second UDRP case.

22   The first did not involve the current part -- the current

23   defendant.

24          THE COURT:  Right, I understand.

25          MR. RINEHART:  And, and they claim to have had no

1    knowledge of it, so it wouldn't have provided a basis for

2    them --

3          THE COURT:  No, no.  And there's difference between

4    registration and use, and we'll get into that, but I, I just

5    didn't see any significance to this information having to do

6    with some Web site or some posting eight or nine years ago

7    having to do with the issues that I need to deal with on your

8    motion and their motion and --

9          MR. RINEHART:  Right.  I understand, Your Honor, but

10   it may be attenuated, but it does show that at least one other

11   party believes the registrant in this case is doing things to

12   try and inflate traffic, to try and generate increased

13   cost-per-click revenue from domains that they're not entitled

14   to.

15         By falsifying impressions, they're increasing the

16   revenue that they're generating from cost-per-click ads, and so

17   it demonstrates a willingness on the part of the registrant or

18   the res defendant to break the law to increase revenue, and so

19   that would be the relevance, if any, Your Honor, and we believe

20   that this is really just a simple cybersquatting matter.  There

21   was a lost UDRP case before this.

22         All in my experience -- or I guess I shouldn't say

23   all, but most in rem cases before the Eastern District follow

24   lost UDRP cases.  The UDRP says you can file a lawsuit before,

25   during, or after the case, and the courts have repeatedly ruled

1    that they're entitled to no deference or review de novo.

2         In the Court's de novo review, we hope that the Court

3    sees that there's a valid and subsisting trademark, the

4    disputed domain is identical, the defendant has a history of

5    registering trademark domains and selling them, and that this

6    is really a case that's more simple than it seems from the

7    memoranda of the, of the defendant.

8         The defendant has sent hundreds of discovery requests

9    in this case and done everything they can to try and find some

10   defense, something to hang their hat on in some sort of fishing

11   expedition.  They claim that the defendant's -- or the

12   plaintiff's use of the, of the mark was token at first.  Well,

13   that's, that's not really a cognizable defense to trademark

14   use, that it wasn't as extensive as someone else's use.  It was

15   being used.

16        They, they have tried to assert that there's an

17   irregularity on the specimen statement of use that were

18   submitted in connection with the trademark filing before the

19   U.S. Patent & Trademark Office, and the --

20        THE COURT:  Well, if -- and I, I think your client

21   admitted at his deposition, didn't he, that "myschool" was not

22   part of the use in commerce; is that right?

23        MR. RINEHART:  He did.  He did, Your Honor.

24        THE COURT:  Okay.  Well, then what, what did you

25   present to the Trademark Office that shows the use of the

1  trademark MYSCHOOL in commerce as a specimen in 2008?

2            MR. RINEHART:  In 2008, it was originally filed, the

3  trademark application, as a 1b intent to use application.

4            THE COURT:  All right.  That was in 2007.

5            MR. RINEHART:  That was in 2007.  In 2008, it was

6  converted to a 1a, and the specimen, the statement of use that

7  was filed in 2008 was a screen shot of, of the plaintiff's Web

8  site at MYSCHOOL411.COM.  It showed the Web site, it showed the

9  mark on the Web site.

10            THE COURT:  Well, where did it show the mark on the

11  Web site other than what was then typed in or inserted that

12  wasn't really part of the use in commerce?  That, that was my

13  question.

14            MR. RINEHART:  I believe, Your Honor, that -- let me

15  see if I can find the specimen, but I believe it shows the mark

16  in the top corner.

17            THE COURT:  Well, that's, that's, that's what was

18  added, isn't it?

19            MR. RINEHART:  No.  The text that was added --

20            THE COURT:  Show me the exhibit then, and then tell

21  me where it is.

22            MR. RINEHART:  Okay.

23            THE COURT:  This may not really be in your motion,

24  but it could be in.

25            MR. RINEHART:  Your Honor, I believe it's included as

27

1    an exhibit to defendant's original motion for summary judgment,

2    and I don't have the exhibit right here in front of me.  I --

3              THE COURT:  All right.

4              MR. RINEHART:  Perhaps I can --

5              THE COURT:  I think it might be -- I'm close to it,

6    if not there.  Is it O?  You've got Exhibit O to defendant's

7    memorandum in support of its motion for summary judgment, which

8    are two pages; is that right?

9              MR. RINEHART:  I believe that is right, Your Honor.

10             THE COURT:  Well, Mr. Rinehart, you don't have the

11   pleadings with you?

12             MR. RINEHART:  I do, Your Honor.  I just don't have

13   all the exhibits.  I hoped to bring them in electronically.

14   They were so voluminous, I -- but I can represent to the Court,

15   Your Honor, that the text MYSCHOOL.COM is not the mark that's

16   shown in the specimen.  It's just -- it was added almost as a

17   header to the top of the specimen.

18             THE COURT:  Right.  And so the only thing that shows

19   up is school, Bad Idea Magazine, message board, Springfield

20   Valley High School, about messages.  I mean, what I see doesn't

21   have "myschool" as a part of any use in commerce in the -- if

22   you took out what was added, that is, the MYSCHOOL.COM, which

23   your client has said was not part of what was actually being

24   used in commerce at the time --

25             MR. RINEHART:  That's accurate, Your Honor.

1          THE COURT:  If you look at the remainder of the

2   exhibit, I'm asking what in the remainder of that exhibit shows

3   the use of "myschool" in commerce.

4          MR. RINEHART:  Well, it's shown in the MYSCHOOL411

5   URL, which is accurate.

6          THE COURT:  So the footer that says

7   WWW.MYSCHOOL411.COM message board, you're saying that's the use

8   of the MYSCHOOL mark in commerce?

9          MR. RINEHART:  Well, it does show the "myschool"

10  expression, yes, in this -- in the specimen, and the parties

11  have agreed that that's accurate.  I, I believe that the title

12  of the Web site, "MYSCHOOL," is shown in the specimen, and if

13  it's not there in your documentation, it was cut off.  Perhaps

14  opposing counsel can help us understand that.  It is shown at

15  the top of the Web site.

16         THE COURT:  Okay.  All right.

17         MR. RINEHART:  Anyway, these are the defenses, and

18  this, this is what's, the items that have become an issue in

19  this motion.

20         THE COURT:  Well, one of the issues you have to show

21  is that you have a valid and subsisting trademark, right?

22         MR. RINEHART:  However, the, the opposing counsel

23  appears to be trying to advance some sort of fraud

24  counterclaim, which was dismissed --

25         THE COURT:  Well --

```
 1              MR. RINEHART:  Both in the deposition and in this

 2   motion, it appears that they're doing that.

 3              THE COURT:  Well, they're asserting it as an

 4   affirmative defense that you don't have a valid trademark.

 5              MR. RINEHART:  But in arguing over intent, in arguing

 6   over what the specimen, whether the specimen that was submitted

 7   has some sort of irregularity, they seem to really be advancing

 8   a fraud counterclaim, which is irrelevant to the, to --

 9              THE COURT:  Well, if you have not submitted

10   sufficient information to the Trademark Office or have

11   submitted false information, if it's false, and have obtained a

12   trademark based on either insufficient or false information,

13   then you shouldn't have a valid trademark, right?  I mean --

14              MR. RINEHART:  That -- I would say that that's right

15   but that the mechanism for attacking its validity would be a

16   counterclaim.  An affirmative defense is not, you know, a

17   vehicle before the Court upon which someone can seek relief.

18              THE COURT:  No, but it cannot be found -- if you're

19   asserting trademark infringement, and let's just look at a

20   basic trademark infringement case, if you are asserting

21   trademark infringement, the other -- the defendant in that case

22   could say, "I'm not responsible for trademark infringement

23   because you don't have a valid trademark."  Same with copyright

24   infringement, same with patent infringement.

25              You can bring defenses to what is a material element
```

 1   of a claim; that is, in order to assert patent, copyright, or

 2   trademark infringement, you have to have a valid patent,

 3   copyright, or a trademark.

 4            MR. RINEHART:  The defendant is asking for the

 5   trademark to be cancelled.

 6            THE COURT:  Right, I understand that, and that may be

 7   a stretch as far as the relief, but the issue that I'm asking,

 8   I mean, talking about now is in order to prevail on a

 9   cybersquatting or cyberpiracy claim under the ACPA, you have to

10   have a trademark, and, you know, I agree that the registration

11   gives you a presumption of validity.  They have raised

12   information that calls that into question.

13            You still have the burden of proof, right?  I mean,

14   you recognize that, that it's only -- you still have the burden

15   of proving the element that is required to show trademark

16   infringe- -- that you have a valid trademark.

17            MR. RINEHART:  That's right, Your Honor.  And for

18   what it's worth, in a deposition, this question was explored by

19   the defendant.  He was asked -- the plaintiff was asked about

20   the specimen.  He was asked about a statement of use, and the

21   parties agreed that he did begin using this trademark on the

22   date that he filed the specimen, December 8, but they've

23   asserted in their memoranda that it was token use, that it was

24   somehow insignificant --

25            THE COURT:  Well --

31

1          MR. RINEHART:  -- because there weren't enough users.

2          And so the use is not disputed.  It's just the extent

3     of it.

4          THE COURT:  Well, it's the use as to all categories

5     is disputed, right?  I mean, the alleged use that shows up on

6     the specimens that you have isn't necessarily consistent with

7     both classifications that you've got in your mark, right?

8          MR. RINEHART:  Well, I, I think that all the services

9     in the mark are shown on the Web site.

10         THE COURT:  Advertising services are showing up in

11    that?

12         MR. RINEHART:  Well, they're shown on the Web site.

13    They were shown on the Web site at the time.

14         He -- the trademark holder is required to submit only

15    one specimen of use, not a separate specimen for each subclass,

16    only a specimen for each international class, and so that

17    specimen required -- it's only required that it show one of

18    those subclasses.

19         THE COURT:  Okay.  And at the time, there were, what,

20    15 or 20 people, most of which were part of the development

21    team?

22         MR. RINEHART:  There were at the time it began, the

23    day it went into use, but within a year, there were 2,000.

24         THE COURT:  Okay.  All right.  So we're -- anything

25    else on the validity of the trademark as it relates to the

1    goods and services -- or the services that are set out in the

2    application?

3           MR. RINEHART:  No, Your Honor.  That's, that's all I

4    have on that point right now.  Perhaps I can save any further

5    arguments for rebuttal, but I think the other side will

6    stipulate that it was being used as I've described.

7           THE COURT:  All right.  Well, what about the bad

8    faith intent to profit from the mark?  You haven't made any

9    argument on that yet.

10          MR. RINEHART:  Well, intent is a, is a difficult

11   thing to establish.  What we have tried to show is we tried to

12   show that the defendant has admitted familiarity not just with

13   the Uniform Domain Name Resolution Policy, the UDRP, but also

14   the ACPA, the Anticybersquatting Consumer Protection Act.  He

15   admitted as much in a couple different places in his

16   deposition.  We've referred the Court to those admissions.

17          That -- defendant has admitted that all of the domain

18   names that he has registered, 50,000 or more, may be

19   trademarked.  I believe that there has not been any submission

20   to the Court that the demonstrative exhibit we showed -- we

21   submitted showing 144 of the last 594 domains that were

22   submitted were trademarked.  They haven't denied that.

23          And so these things show that the defendant is

24   familiar with the cybersquatting laws, that he understands he's

25   selling trademark domains, and demonstrate a bad faith intent

1    to, to profit.  The only argument that the defendants have

2    advanced for safe harbor, for believing their registration was

3    valid, was the first Uniform Domain Name Resolution --

4              THE COURT:  No, no.  Their main argument is:  We

5    didn't know that there was a trademark for "myschool," and,

6    Mr. Rinehart, you said on no less than six times in your

7    pleadings that you have filed here that there is evidence

8    showing that the registrant knew of the trademark at the time

9    it was registered.  I need you to explain to me how you can

10   make those statements six times in pleadings that you have

11   filed with the Court.

12             MR. RINEHART:  Okay, Your Honor.  This fits into the

13   issue of actual notice and constructive notice.

14             THE COURT:  And you said actual notice, so --

15             MR. RINEHART:  Right.  We believe that the defendant

16   had both actual and constructive notice and --

17             THE COURT:  Well, what, what evidence do you have of

18   that?

19             MR. RINEHART:  The evidence is the e-mail thread

20   that's included as Exhibit K to the plaintiff's --

21             THE COURT:  So let's just get the time frame down.

22   The registration you now have acknowledged was in March of

23   2013, right?

24             MR. RINEHART:  Um-hum, yes, Your Honor.  Between

25   March 13 and March 14 of 2013.

34

```
1            THE COURT:  And this e-mail that you are -- that you
2   say shows that they had knowledge of the trademark in March of
3   2013 is dated September 2014; is that right?
4            MR. RINEHART:  It is.  It's September 4, 2014.
5            THE COURT:  All right.  So how do -- how does an
6   e-mail -- and knowing how they claim that e-mail came into
7   existence -- how does the existence of an e-mail on
8   September 4, 2014, establish that they had knowledge of
9   something 18 months earlier?
10           MR. RINEHART:  It's the content of the e-mail, Your
11  Honor.  The defendant, Yonaton Belousov, is e-mailing the prior
12  registrant in 2010 and discussing the case in 2010 that
13  involved the trademark and demonstrating a familiarity with
14  that case.  There is no introduction:  "Hi, my name is Yonaton.
15  Do you remember this case?"
16           It's, it's an obvious familiarity that exists between
17  the parties.  Any reasonable person would read that e-mail and
18  know that they both knew about it.
19           THE COURT:  Well, no.  They knew each other --
20           MR. RINEHART:  Well, I --
21           THE COURT:  -- and there was no --
22           MR. RINEHART:  I would --
23           THE COURT:  I mean, it's clear that they knew each
24  before 2014.
25           MR. RINEHART:  It is, but I believe, Your Honor, that
```

1    it's equally clear that they knew the case.  They immediately

2    launched into a discussion of the case.  He says, "I need the

3    documents from that case."

4          He says, "Okay.  I'll send them to you."

5          It's not -- there's not any question, any inquiring

6    about whether he was the proper party to the case, and as the

7    complaint was originally filed, we believe the registration

8    date was the date of the privacy (inaudible), which went on

9    after this e-mail.  Now, I think this e-mail alone shows

10   knowledge of the case in 2010.

11         THE COURT:  Well, knowledge of the case on September

12   4, 2014.  I, I still don't understand how you say that shows

13   knowledge of the first UDRP proceeding or the trademark, actual

14   knowledge of the trademark any earlier than that e-mail.

15         MR. RINEHART:  Well, it's a twofold inquiry.  First,

16   if you understand or if you know that the UDRP case existed in

17   2010, you know the trademark existed because the trademark

18   underlied the UDRP case.  So the question is did he know of the

19   UDRP case, and the e-mail shows not that he acquired knowledge

20   that day but that he acquired it before, and the earlier case

21   existed in 2010.

22         THE COURT:  Well, but was it a day before?  Was it a

23   week before?  Was it two hours before he sent that e-mail?

24   What, what other than pure speculation is it that he knew back

25   in March of 2013 of the first UDRP proceeding and of a

36

1    registered trademark for myschool?

2              MR. RINEHART:  We would like to have more evidence of

3    that.  We'd like to get the e-mails from his attorney.  That

4    was the, the purpose of the motion to reopen limited fact

5    discovery, but the only, the only --

6              THE COURT:  No, I heard that motion at ten.

7              MR. RINEHART:  I understand.

8              THE COURT:  The reason I denied it, you can get the

9    transcript and read it again, but, you know, you had that

10   information on June 1.  You knew when they were saying they had

11   notice of it.  You had that e-mail as of June 1.  You deposed

12   him on August 14.  You had a full opportunity to ask him

13   questions.  The only objection that was made at the time was

14   not to tell him about advice, and that was a proper objection,

15   not to talk about advice.

16             You had the opportunity -- he told you he got it from

17   his lawyer.  You went on and asked other questions about

18   certain things, you know, what did you do after this and what

19   did you do after that.  So there's absolutely no basis to

20   reopen discovery.  You had full opportunity to find out

21   anything you needed to find out about that e-mail and their

22   position as to when they first got notice, having been aware of

23   that since June 1.

24             MR. RINEHART:  I understand, Your Honor.  To answer

25   the Court's question, the only evidence that we have of actual

1  notice, which we think is evidence and does establish actual

2  notice, is the admission of the defendant in his deposition

3  that he's familiar with these laws, that he does trademark

4  investigations before he registers the domains, and this e-mail

5  showing that prior to the second UDRP case --

6          THE COURT:  What is the deposition testimony that he

7  does trademark investigations?

8          MR. RINEHART:  Well, I have the deposition here, and

9  if you'd like me to, I can find those references while --

10          THE COURT:  Fine.

11          MR. RINEHART:  He, he, he -- there's a discussion in

12  the deposition about whether he understands U.S. trademark law,

13  whether he investigates the domains that he's registering to

14  see if they're trademarked, and he says that he does.

15          THE COURT:  What was his testimony about the

16  investigation as to whether "myschool" was trademarked?

17          MR. RINEHART:  He says that he saw myschool on the

18  domain name Sedo.com or "Sedo," it's an auction Web site for

19  domain names, and that he thought it was a good price and that

20  he registered it.  He denies knowledge that it was -- of

21  knowing that it was trademarked and of the earlier UDRP case,

22  despite earlier in the deposition testifying that he does do

23  these searches to see if they're trademarked, and so we believe

24  his testimony is contradictory in a sense.  We believe he's

25  trying to hide the fact that he had actual notice.

1          THE COURT:  Okay.  Well, let's go through the bad

2    faith issue again.

3          MR. RINEHART:  Okay.

4          THE COURT:  So we -- they registered the mark in

5    2013 --

6          MR. RINEHART:  I'm sorry, 2009 the mark was

7    registered.

8          THE COURT:  Well, when -- I'm talking about when the,

9    registered the domain name.

10          MR. RINEHART:  The domain name, yes.

11          THE COURT:  He got the domain name in 2013.  The

12   statute talks about bad faith intent, but it talks about

13   registration and use, so I want to talk first about the

14   registration.  You're saying there was bad faith intent because

15   based on a September 4, 2014 e-mail, you believed he had notice

16   of the registration back in March of 2013; is that right?

17          MR. RINEHART:  No, we're also saying that his

18   deposition establishes that he generally acquires this notice

19   and that the domains that he sold show that he, he traffics in

20   trademark domains and that he knows this, his deposition knows

21   this.

22          THE COURT:  And some of those names are things like

23   thugs.org, billie.org, Gatsby, Gecko, snuggle, bonny,

24   asteroids.  Those are all ones that you say show that he is a,

25   registering in trademarked domain names?

39

```
 1              MR. RINEHART:  Some of the domain names have more

 2    descriptive uses than others.

 3              THE COURT:  24hours.org?

 4              MR. RINEHART:  Well, these --

 5              THE COURT:  Predator.org, rams.org, ascot.org,

 6    eiffel.net, ozark.net, grunge.net, reinvent.net,

 7    michelangelo.org.

 8              MR. RINEHART:  We have tried to point out the domains

 9    that trademarks insisted on.  However, there's also

10    fujisan.net.  There's iweb.org, there's --

11              THE COURT:  Well, iweb?

12              MR. RINEHART:  Well, it's trademarked, Your Honor.

13              THE COURT:  Chalkboard, gotnet?

14              MR. RINEHART:  Some of these are more clear trademark

15    violations than others, Your Honor, but there are some on here

16    that could not be used for anything but to sell to the

17    registered trademark holder:  Selfiestick; Comeaux;

18    worldseries.net, this is trademarked by the, you know, the

19    National Baseball League; fountainebleau, spelled the way that

20    it is trademarked in both U.S. and Canada.

21              And so we submitted the domains that have trademarks

22    on them, recognizing that not all of these would be found to be

23    trademark infringement if litigated over, but I think some of

24    them would, and that combined with the admission of the

25    defendant that he knows these domain names are trademarked.
```

40

```
 1              The defendant may think that U.S. cybersquatting law

 2    isn't fair or that he doesn't have to abide by it in Canada,

 3    but it is the law, and it's meant to protect trademark holders.

 4              THE COURT:  Well, yes, that's true, but the statute

 5    requires much more than I have a trademark and the domain name

 6    is identical or confusingly similar to my trademark.

 7              MR. RINEHART:  It does.

 8              THE COURT:  And, you know, that, that's where the

 9    extra protection comes in to people who are registering domain

10    names, and if it was as simple as I have a trademark and the

11    domain name is the same as my trademark, I win and I get it,

12    you might have an argument here, but the statute requires

13    substantially more than that, and there are, as you well know,

14    many people who use the same trademark in different areas of

15    commerce.

16              MR. RINEHART:  Yes, Your Honor, there are.

17              THE COURT:  So Delta Faucets, Delta Airplanes, you

18    know, that, that domain name would be pinging back and forth

19    all the time if all you had to do is show I have a registered

20    trademark and it is the same as my trademark.

21              MR. RINEHART:  And in that case, there are different

22    parties using the mark.  In this case, there are not.  There is

23    no use of the mark by the defendant and --

24              THE COURT:  Well, this is not a mark that isn't in

25    use.
```

41

1            MR. RINEHART:  Well, use in commerce.

2            THE COURT:  This is not a parked domain name where it

3    is just being stored.  It is generating income, and you're

4    saying -- and that goes to your intent to profit because they

5    are profiting from the use of the mark, and so they are using

6    the mark.

7            MR. RINEHART:  Your Honor, all parked domain names

8    that are being passively held are generating revenue.

9            THE COURT:  No.  There are many domain names that you

10   go to it and says "Web site under construction" or it doesn't

11   resolve to a Web page at all.  I can reserve a domain name and

12   not do anything with it.

13           MR. RINEHART:  But the term "parked" implies that

14   there is a Web site with cost-for-click ads, and so it's

15   parked, it's directing to some parking spot that has ads on it,

16   and that's what the defendant is doing in this case.  He's not

17   making use in commerce the way Delta Faucets would be if the

18   DELTA generic mark or Delta Airlines would be.

19           And in a case where intent is difficult to prove, and

20   the Fourth Circuit has said that, we've done as much as anybody

21   can to try and show it.  We've shown these other domains.  He's

22   admitted he knows they're trademarked.  We have e-mails at

23   least showing some sort of knowledge of, of the earlier case,

24   and I think that that's enough to get over the, the intent

25   portion of the standard, and intent is typically supposed to be

42

1    inferred from the subsequent actions of the, of the registrant

2    anyway, and I think if every ACPA case were lost because you

3    couldn't show the intent of the registrant, they all would be

4    lost.  So --

5              THE COURT:  Well, talk about the use of the mark now.

6              MR. RINEHART:  Well, the --

7              THE COURT:  If, if I find that there's not sufficient

8    evidence to show that he was aware of the mark so he could not

9    have had a bad faith intent to profit from the mark that he

10   wasn't aware of when it was registered in March of 2013, he

11   clearly became aware of it in September of 2014.

12             MR. RINEHART:  Now, Your Honor --

13             THE COURT:  So that gets to the use.

14             MR. RINEHART:  One final point:  The, the Lanham Act

15   imputes constructive notice to all domain name registrants, so

16   even if the Court were to rule that he did not have actual

17   notice, constructive notice would still be an issue.

18             THE COURT:  Well --

19             MR. RINEHART:  It is a --

20             THE COURT:  -- again, that goes to the same issue of

21   I have a trademark; you have notice of it just because I have a

22   trademark.

23             How does bad faith intent to profit then come into

24   play if you automatically have notice of it through

25   constructive notice by the registration of the mark?

43

1          MR. RINEHART:  Okay.  Well, that moves on into the

2     next, the next point you wanted to get into, which is the bad

3     faith use, and there are a lot of factors that can be

4     considered in bad faith use, and one is legitimate use by the

5     registrant in connection with the goods and services, and in

6     this case, the use by the registrant would never constitute use

7     in commerce before the Trademark Office.

8          There are just simply ads to other parties being put

9     on the --

10          THE COURT:  Well, is the requirement in the bad faith

11     analysis the same as the requirement that you would have in

12     registering a trademark?

13          MR. RINEHART:  Well --

14          THE COURT:  You said a couple of times now that it

15     wouldn't be considered use in commerce by the Trademark Office,

16     and I assume you mean for registering a mark.

17          MR. RINEHART:  Um-hum.

18          THE COURT:  But what, what do you have to say that

19     the use has to be the -- the same standard would apply as to

20     use in commerce for under the Cyberpiracy Prevention Act as for

21     trademark registration?

22          MR. RINEHART:  Well, I have the, the cases that I

23     cited in the plaintiff's motion for summary judgment brief, and

24     these factors are listed and --

25          THE COURT:  Well, it says "bona fide offering of any

44

1    goods or services."  That's one of the factors.

2              MR. RINEHART:  Yes.

3              THE COURT:  Right?  So if you go to the Web site

4    MYSCHOOL.COM, there are goods and services being offered at

5    that Web site.

6              MR. RINEHART:  I would disagree, Your Honor.  There

7    are links to other parties who are offering goods and services.

8              THE COURT:  Well, your client's Web site is the same

9    way.  You've got to go to a link to get to goods and services,

10   or at least on the specimen that I've seen.

11             MR. RINEHART:  Well, when you arrive at the Web site,

12   you have the opportunity to post messages on the Web site

13   itself to acquire information from the Web site itself.  The

14   defendant's Web site differs in that it's no more than just a

15   parked page, a landing page for third parties to advertise.

16   There aren't any actual goods or services on the Web site, nor

17   is the mark used on the Web site, I don't believe.

18             THE COURT:  Okay.

19             MR. RINEHART:  If simply registering a domain name or

20   use, then that, that prong of the standard would be pretty

21   shallow.

22             THE COURT:  Let's go back.  You say it isn't used on

23   the Web site?  I mean, it -- the banner is "MYSCHOOL.COM,"

24   right?  Can you see that?  It's one of your exhibits, so I

25   would --

45

1          MR. RINEHART:  It is, Your Honor, but to constitute a

2     specimen, it has to be shown in connection, close connection

3     with the goods or services.

4          The defendant, all of its pages, all 50,000 of them

5     automatically put the name of the domain name at the top of the

6     parked page, the landing page, and put these same ads on the

7     page.  To -- for the Court to rule that these ads were a bona

8     fide offering of goods or services would be to rule that the

9     defendant has 50,000 trademarks for each of its landing pages.

10         THE COURT:  It's not a trade -- I'm not asking

11    whether the registrant of MYSCHOOL.COM has a trademark in

12    MYSCHOOL.COM.  My question goes to whether the use of the

13    domain name MYSCHOOL.COM is a use of the domain name in

14    connection with the bona fide offering of any goods or

15    services.

16         MR. RINEHART:  Okay.

17         THE COURT:  That's what the ACPA requires, not that

18    it be use in commerce as set out in the trademark prosecution

19    requirements.

20         MR. RINEHART:  I understand.

21         THE COURT:  All right.  So let's go back to the use

22    after September 4, 2014.  Help me understand what your argument

23    is as to why any use of the mark after that time could be

24    considered to be a bad faith intent to profit from the mark.

25         MR. RINEHART:  Well, after September of 2014, I would

46

```
 1    think it would be undisputed that the defendant did have

 2    knowledge of the mark because the second UDRP case had been

 3    filed at that point informing him of the mark, and he continued

 4    to use the domain name in the same way he had before, to, to

 5    have these ads on the site.

 6              THE COURT:  And at that point in time, he was also

 7    aware of the first UDRP proceeding, right?

 8              MR. RINEHART:  He was.

 9              THE COURT:  So why, why is that bad faith intent to

10    profit from the mark given the knowledge that he had on or

11    around September 4 of 2014?

12              MR. RINEHART:  Well, Your Honor, we believe that,

13    that the -- there were both express and implied

14    misrepresentations made in the UDRP cases, and that's one of

15    the reasons we're asking the Court to review them de novo

16    and --

17              THE COURT:  Well, I, I understand I don't -- I'm not

18    here as an appellate court to make a decision whether the UDRP

19    proceeding was accurate or not, okay?  And, you know, I, I

20    understand your position on that, that, you know, they are not

21    persuasive, they're not -- but the question I'm trying to get

22    to is that being aware of the earlier UDRP proceeding and

23    contesting the allegations in the second UDRP proceeding, how

24    does that show bad faith and intent to profit from the mark

25    from September 4 of 2014 going forward?
```

```
 1             MR. RINEHART:  Well, the, the behavior was the same,
 2   and it, it was cost-per-click ads of third parties, he's
 3   benefiting at 700 a month, and he's continuing to try and sell
 4   the domain name to anybody that he can, and so he's continuing
 5   to try and profit in the same way as he was before.
 6             THE COURT:  Well, he's, he's had offers to -- he's
 7   trying to sell -- let me understand your argument on that.
 8   What is your basis for saying that he is trying to sell the
 9   domain name as opposed to he has when asked responded to
10   inquiries about buying the domain name in amounts that clearly
11   shows no interest in selling the domain name?
12             I mean, I think at least having -- my understanding
13   of the record is that's what's happened, not that he has
14   actively been trying to sell the domain name.
15             MR. RINEHART:  I believe, Your Honor, that that --
16   that the Court is -- needs a little more information on that
17   issue.  He was actively trying to sell the domain name by
18   posting it on auction sites.  Even through the commencement of
19   this litigation, he had it posted on third-party Web sites
20   where he was trying to sell it as quickly as possible.  If the
21   Court remembers, there was a motion to freeze the domain with
22   the registry Verisign because he was doing just that, and I
23   don't have in my head a list of all the places where he's
24   trying to sell it, but he has posted it on Sedo, and he has
25   posted it on LiveAuctions.com.  I don't believe that's disputed
```

1    that he's done that.

2              THE COURT:   Okay.   Now, while you're up, I want you

3    to address your -- the issue as to the postings that have been

4    made part of the record either by your client or by your

5    client's cousin or -- I want to hear what your position is as

6    to who was actually making those postings.

7              MR. RINEHART:   Your Honor, the, the postings in

8    question were made, I believe, on September 2 of, of this year,

9    after discovery closed, after the litigation had been going for

10   some period of time.   If you look at the, the Web site there,

11   there are 37 different posts, and different parties seem to be

12   antagonizing each other.   This is not a -- these are not

13   records that I think any party would be happy knowing suddenly

14   were in front of a court of law, but they didn't expect that at

15   the time.

16             We believe -- and, of course, we can't do discovery

17   on it because it happened after discovery -- that some of the

18   posts that were galvanizing my client or his cousin were posted

19   by the defendant, including a post where he threatens to make

20   him bankrupt and on welfare.   His posting was in response to

21   that posting.

22             And so this is just an example of the parties

23   bickering, you know, without their counsel's knowledge on the

24   Internet.   And the -- my client has made settlement offers,

25   including settlement offers that would allow the defendant to

1  keep the res.  He does not want this litigation to become

2  protracted, the way that it has.

3          And so this is just the parties' arguing and venting

4  on the Internet.

5          THE COURT:  Well, clearly, that is completely

6  inconsistent with what that posting was, and it does appear

7  that whoever made that post had information that was of, not

8  available to the general public as to the status of the case

9  and what was going on in the case, so it either had to have

10 been your client or someone directly related to your client who

11 made that posting, right?

12         MR. RINEHART:  Yes, Your Honor.  I believe it was

13 actually typed by my client's cousin but with the knowledge of

14 my client.

15         THE COURT:  In trying to make this the most expensive

16 litigation ever, I mean, those are, are inconsistent with your

17 statement that your client didn't want this case to turn into

18 what it has turned into, and he's going to appeal it, he's

19 going to do this, he has nothing to lose, I mean, those are,

20 are troublesome statements for a litigant to be saying.

21         MR. RINEHART:  What I would submit, Your Honor, is

22 that to the extent actions speak louder than words, his actions

23 have shown that he does not want the case to become protracted

24 and expensive, and there have been settlement offers to dismiss

25 the case at a couple of different points because he doesn't

50

1    want the case to become so protractive and -- protracted and

2    expensive.

3            And if you look at the record, it's actually the

4    defendants who have attempted to protract it, to the point that

5    it is now through these discovery requests, through the

6    behavior that is complained of in the reply brief, and so I

7    would ask the Court just to keep that in mind in evaluating the

8    issue.

9            THE COURT:  Okay.  Anything else that you want to

10   argue in your first go-round?

11           MR. RINEHART:  Not unless the Court has additional

12   questions.  I'll save the rest for rebuttal.

13           THE COURT:  Okay.  Thank you.

14           All right, Mr. Weslow?

15           MR. WESLOW:  Thank you, Your Honor.  Your Honor, I

16   know that the Court is familiar with our papers, and I do not

17   want to belabor the points, but I do want to highlight three

18   issues on the defendant's motion for summary judgment.

19           First, the ACPA does require specific bad faith

20   intent to profit, which is not possible without knowledge of

21   the trademark; second, the registration and use of the domain

22   name here constitutes statutory fair use under the Lanham Act;

23   and third, the, excuse me, registration of the domain name is

24   also protected under the ACPA safe harbor.

25           It is well settled that the ACPA requires plaintiff

1    to show that the defendant had a specific bad faith intent to

2    profit from the plaintiff's trademark.  This is shown both by

3    the legislative history and the numerous court opinions cited

4    in our papers.  The plaintiff has not provided a single ruling

5    in support of the allegation that bad faith intent to profit is

6    not required in an in rem action or that constructive knowledge

7    of a trademark is sufficient for an ACPA action as opposed to a

8    trademark infringement action.

9            The discovery responses and documents produced in

10   this matter all corroborate the sworn testimony that the owner

11   of the domain name had no prior knowledge of the plaintiff or

12   his very limited use of the term "myschool" when acquiring the

13   domain name.  There simply is no contrary evidence.  And

14   without knowledge of the trademark, the owner of the domain

15   name could not have registered the domain name with a bad faith

16   intent to profit from the plaintiff's trademark.

17           Plaintiff's counsel's comment that the evidence in

18   support of bad faith intent, he indicated there were two

19   things.  The e-mail from Mr. Belousov to Mr. Booth, which Your

20   Honor correctly pointed out occurred after receipt of the UDRP

21   complaint, that could not show prior knowledge of the trademark

22   a year and a half prior.

23           The second item that plaintiff's counsel identified

24   as supporting evidence of bad faith intent was the deposition

25   transcript, and specifically he referred to Mr. Belousov's

1    investigation before purchasing the domain name.

2            The transcript actually shows that Mr. Belousov's

3    pre-purchase investigation included use of a proprietary

4    software and manual review of more than 100 variables regarding

5    the desirability and generic nature of the domain name.  This

6    investigation showed over 3,000 domain names containing

7    "myschool," which confirmed that no party owned exclusive

8    rights in that word combination, and also identified thousands

9    of Web sites containing "myschool" to confirm that no party

10   owned exclusive rights in the domain name.

11           Mr. Belousov also assessed the domain name's

12   composition --

13           THE COURT:  Well, I take it that this, you know,

14   hundred-factor analysis doesn't do a trademark search?  Is

15   that --

16           MR. WESLOW:  No.  No, Your Honor, that's correct.

17           THE COURT:  Okay.

18           MR. WESLOW:  At that, at that point in time, the

19   software which Mr. Belousov had custom built for this purpose

20   did not also query trademark databases.

21           THE COURT:  So when there's -- the statement that he

22   does investigations having to do with trademarks, what is

23   that --

24           MR. WESLOW:  Your Honor, I think --

25           THE COURT:  What is there in the record that

53

1    indicates that he did trademark registration investigations?

2          MR. WESLOW:  Your Honor, I think that's a

3    mischaracterization of the deposition testimony.  I don't

4    believe that Mr. Belousov said that he undertook trademark

5    investigations.  He did use his proprietary software as well as

6    Internet research, but at that point in time, he was not in the

7    practice of searching trademark databases.

8          THE COURT:  Okay.

9          MR. WESLOW:  Neither of those two categories of, of

10   information that the plaintiff identified support the argument

11   that the defendant -- the owner of the domain name had a

12   specific knowledge of the trademark and bad faith intent to

13   profit from the trademark when registering the domain name.

14   There simply is no contrary evidence, and without knowledge of

15   the trademark, the owner of the domain name could not have

16   registered the domain name with bad faith intent to profit from

17   the plaintiff's trademark.

18          Moving on to the second category I wanted to

19   highlight, the registration and use of the domain name

20   constitutes statutory fair use under the Lanham Act.  Under the

21   statute, a junior user may use a registered trademark as long

22   as it is a use other than as a trademark.

23          Descriptive and suggestive trademarks such as

24   MYSCHOOL are particularly susceptible to fair use given that

25   the words have plain meanings and are not removed from the

1   English language by virtue of one party obtaining a trademark

2   registration for a specific set of goods or services.

3          It's undisputed that the owner of the domain name

4   used the term "myschool" only in connection with the

5   descriptive meaning, and Mr. Belousov testified that, quote,

6   from day 1, he made sure that all of the links on the site are

7   completely targeted to the descriptiveness of the name.

8          THE COURT:  What about "classmates"?

9          MR. WESLOW:  Your Honor, Google requires any Web site

10  owner to include a search box that in essence runs a Google

11  search beneath the box.  It says "search advertisements."  In

12  this case, the only way the plaintiff was able to trigger these

13  specific advertisements for "classmates" was to use that search

14  functionality and search for certain terms like "high school,"

15  for example, and other terms.

16         The plaintiff's use of that search did not include

17  searching "myschool."  It included other terms that, that

18  plaintiff figured out would trigger these specific ads, such as

19  "classmates."

20         THE COURT:  Well, what, what are the ads that show up

21  when you just put in "MYSCHOOL.COM"?

22         MR. WESLOW:  In the search box?

23         THE COURT:  Yeah.

24         MR. WESLOW:  They would be roughly identical to the

25  ads that are shown on the, the front page of the site because

1    it's the same Google search algorithm.  So Google pre-populates

2    the main page with input from the domain name owner, and if a

3    search for that same term was put into the search box, it would

4    result in roughly the same advertisements.

5            THE COURT:  Well, I understand, I mean, you, you say

6    that the Plaintiff's Exhibits M and N, I guess, were the result

7    of going in and doing a search under "high school."  Is, is

8    there anything in the record that shows me what it is when --

9    what the original landing page is for "MYSCHOOL.COM" in the

10   record?  Where is it?  Is there an exhibit that shows that?

11           MR. WESLOW:  Your Honor, I don't believe we, we put

12   an exhibit into the record showing the, the site without the

13   search function that plaintiff, that plaintiff put into the

14   record.

15           THE COURT:  Okay.  So I take it your fair use

16   argument goes really to, well, it goes to both, but it's

17   focusing more on the September 4 going forward time period

18   since at that point in time, your client knew of the trademark

19   registration; is that right?

20           MR. WESLOW:  Yes, Your Honor.  It's our position that

21   the, any use of the domain name following the initial purchase

22   in March of 2013 qualified as statutory fair use when the

23   defendant or owner of the domain name acquired knowledge of the

24   trademark.  The use after knowledge of the trademark would also

25   be a statutory fair use given that the use was consistent from

1    the initial purchase of the domain name.  All use was tied to

2    the descriptive meaning of the term.  All the content of the

3    site was tied to the descriptive meaning of the term.

4             The knowledge of the trademark occurred at the time

5    of the second, excuse me, second UDRP proceeding.  After

6    learning of the -- after receiving a second UDRP proceeding,

7    the domain name owner learned of the first and then

8    subsequently won that second proceeding as well.  Those

9    proceedings then validated his belief in the lawfulness of his

10   ownership and use of the domain name.  The use has been

11   consistent from March of 2013 through to the present, excuse

12   me, and always tied to the descriptive nature of the name.

13            The third point I wanted to highlight is that the

14   domain name -- the use of the domain name registration and use

15   is also protected by the ACPA safe harbor.  Under this

16   provision, bad faith shall not be found in any case in which

17   the Court determines that the person believed and had a

18   reasonable grounds to believe that the use of the domain name

19   was a fair use or otherwise lawful.

20            The ACPA safe harbor applies here for three reasons:

21   The first were the registrant's pre-purchase efforts to assess

22   the nature of the domain name, which I discussed a moment ago;

23   the second is that the domain name's composition is made up of

24   common nouns and the domain name was purchased for that

25   descriptive meaning; finally, the two UDRP proceedings issued

1    by a total of six panelists confirmed the right of a third

2    party to use the MYSCHOOL.COM domain name notwithstanding

3    plaintiff's trademark rights.

4             As I mentioned, these UDRP proceedings confirm the

5    reasonableness of the registrant's belief that use of the

6    domain name was lawful.

7             THE COURT:  Well, why, why wouldn't that come into

8    play in every ACPA case if this safe harbor applies to, you

9    know, you've lost the UDRP, you now are appealing it, I don't

10   have bad faith because I want a UDRP proceeding?  I don't

11   understand that.

12            MR. WESLOW:  Your Honor, I, I would say it would have

13   some bearing on the subsequent litigation, but it's not our

14   argument that that alone is dispositive.  That fact that the

15   UDRP decision was rendered in favor of the domain name is one

16   component and to -- confirming the lawfulness of the use of the

17   domain name, but certainly I would agree that that alone would

18   not be sufficient to make a finding that the ACPA safe harbor

19   applied in any case where there was an unsuccessful UDRP

20   proceeding.

21            THE COURT:  Well, what other evidence do you have

22   about the safe harbor other than the UDRP proceeding?

23            MR. WESLOW:  The safe harbor applies in any case that

24   the person believed and had reasonable grounds to believe that

25   use of the domain name was a fair use or otherwise lawful.  In

1   support of that qualification for the safe harbor, I mentioned

2   the pre-purchase investigation undertaken by the owner of the

3   domain name.  This included use of his software that identified

4   over 3,000 third-party-owned domain names, confirming that no

5   one owned exclusive rights in the name, thousands of other Web

6   sites including "myschool," as well as his intention to use the

7   domain name for its descriptive use and his making good on that

8   intention and using the domain name from the date of purchase

9   to the current time in association with the descriptive use.

10          Your Honor, as for the argument that the owner of the

11  domain name owns 50,000 domain names, as the Court correctly

12  pointed out, ownership of domain names alone is not sufficient

13  to equal -- to render a finding that a domain name owner is a

14  cybersquatter, and as for these 50,000 domain names, the

15  plaintiff has not shown a single domain name that corresponds

16  to a coined trademark like Verizon and Porche.  That's by

17  intention and through the deliberate business practices of the

18  domain name owner to make sure that he's not purchasing coined

19  domain names.

20          As for descriptive and suggestive trademark

21  registrations, these trademark registrations do not remove the

22  words from the English language or preclude statutory fair use

23  of the words or invocation of the ACPA safe harbor.  The few

24  domain names that counsel highlighted a few moments ago are all

25  descriptive and suggestive trademarks that are clearly subject

1   to statutory fair use as well as the safe harbor as well as if

2   this were a trademark infringement case, there could be

3   noninfringing uses such as the Delta-Delta example highlighted

4   by the Court.

5          Your Honor, finally, in relation to the referenced

6   attempts to sell the domain name, I think the record is clear

7   that all of the quotations for prices to sell the domain name

8   were in response to inbound inquiries that were received by the

9   domain name owner.

10         The allegation that the domain name owner is

11  attempting to sell the domain name through auction sites is

12  unsupported.  I think that was raised at the deposition.

13  There's just no -- that's speculation.  There's nothing to

14  support that.  The --

15         THE COURT:  Well, are they listed on auction sites,

16  and did he ask that they be listed on auction sites?

17         MR. WESLOW:  He did not ask that they be listed on

18  auction sites.  He does have a contract with a broker to

19  respond to inbound inquiries, such as the inquiries that were

20  received over the course of the case by a friend of the

21  plaintiff.

22         THE COURT:  What about the factor, the person's prior

23  use, if any, of the domain name in connection with the bona

24  fide offering of any goods or services?

25         MR. WESLOW:  Your Honor, the -- as the Court pointed

60

1   out, this is not a static Web page with an "under construction"

2   label.  This is a functioning Web site.  Users who type

3   in "MYSCHOOL.COM" can click on the links, being routed to

4   information that they may be looking for.  This is a component

5   of the defendant's business and is a pretty significant

6   business that third parties engage in on the Internet today.

7           The fact that the content of the site has nothing to

8   do with the plaintiff's trademark or the plaintiff's service

9   shows that this is a legitimate use of the domain name.

10          THE COURT:  Okay.  Any other arguments at this time?

11          MR. WESLOW:  No, Your Honor.  I'd be happy to answer

12  any questions.

13          THE COURT:  All right, thank you.

14          Okay.  Mr. Rinehart?

15          MR. RINEHART:  Your Honor, just since the defendant's

16  counsel has been speaking, I've been going through the

17  deposition and trying to find examples of the defendant,

18  Yonaton Belousov, discussing these search criteria that he

19  uses, and the deposition is extensive.  It's over 300 pages, I

20  believe, but he does talk about --

21          THE COURT:  Well, the testimony itself was only about

22  150 pages.

23          MR. RINEHART:  Okay.  That's right.

24          THE COURT:  Do I have -- there was only one

25  deposition.  It was all done on August 14; is that correct?

61

1          MR. RINEHART:  That's right.  I, I believe on page

2    66, 67, and 75 of the deposition, he does discuss trademarks,

3    and these are just the examples I've been able to find just in

4    the last minute or two, and his understanding that some of the

5    domains may be trademarked.

6          He says on page 75 that one of the criteria that he

7    uses is he looks at how many times people are searching on

8    Google for that expression that's incorporated by the domain

9    name, and the more often it's being searched for, the more

10   valuable the domain is to him.  This suggests that he's

11   registering domain names that he knows people are looking for.

12         THE COURT:  That's going to generate traffic.  It

13   doesn't -- just because somebody, I mean, I go in and search

14   for, you know, UVA football, I know that's a trademarked, you

15   know, I know UVA is, football probably has some kind of

16   trademark rights to it, but, you know, if a lot of people are

17   doing that, that just means he's looking for a domain name

18   that's going to drive traffic, right, not that it's got a

19   trademark.

20         Just, just because something is popular doesn't mean

21   it's got a trademark to it.

22         MR. RINEHART:  But it does -- that combined with his

23   admission that he knows the domains are trademarked does

24   suggest that he's, that he's aware that some of the traffic is

25   being driven because it's trademarked.

```
 1              THE COURT:  Okay.

 2              MR. RINEHART:  And presumably well-known trademarks

 3    would have higher traffic, and so he is trying to benefit in

 4    that sense from traffic that may being intended for, for

 5    trademarked domain names.

 6              This broker agreement that the defendant had, it did

 7    say that the broker would try and sell the domain name on these

 8    other Web sites, so the defendant knew and took steps to

 9    contract with a party toward a sale of domain name on other

10    third-party Web sites.

11              THE COURT:  Well, if, if you look at your Exhibit M,

12    there is a footer that apparently shows up on some of these

13    indicating, "This domain may be for sale."  Is that what you're

14    talking about?

15              MR. RINEHART:  Well, he -- the domain name itself

16    says the domain -- the Web site at the domain MYSCHOOL.COM says

17    the domain name may be for sale, but there are other

18    third-party Web sites where the domain is listed for sale, and

19    apparently, it's listed by this broker with whom the defendant

20    contracted, but the fact is an agent of the defendant or the

21    defendant himself is listing the domain for sale in all of

22    these third-party Web sites and accepting offers from

23    individuals who see the domain name for sale on these Web

24    sites.

25              THE COURT:  All right.  Well, where -- what exhibits
```

63

1    do you have that support that representation that these

2    other -- that this domain name is being listed by auction

3    sites?

4              MR. RINEHART:  Well, I, I would have to refer the

5    Court back to the motion for the registry lock, which has --

6              THE COURT:  No, we're here on a motion for summary

7    judgment.  I mean, that doesn't incorporate each and every

8    pleading for each and every motion that's been filed.  I'm

9    deciding this on the record that's in front of me on the motion

10   for summary judgment.

11             So what, what evidence do you have as to this domain

12   name being registered by the registrant or being --

13             MR. RINEHART:  Well, there, there was an admission of

14   counsel just a moment ago that the defendant is doing this.

15   The deposition, I believe, talks about it.

16             THE COURT:  All right.  Well, let's --

17             MR. RINEHART:  The, the only time Belousov admits in

18   the deposition he makes most of his money off of the purchase

19   and sale of these domains --

20             THE COURT:  Right.  I mean, he talks about that he

21   tried to liquidated some, he sells others, but, I mean, what he

22   does with all of them is different than what he's doing with

23   this one, so --

24             MR. RINEHART:  It wasn't an issue that was briefed in

25   summary judgment very well, but there is this broker agreement.

64

1    On page 95 of the deposition, Belousov, line 15, says that the

2    domain -- there is a link on the domain name saying that they

3    might be for sale.

4              THE COURT:  They click it.

5              MR. RINEHART:  Yeah.  He talks about the sales cycle

6    on 97.

7              He talks on page 101, I think this is important, that

8    the domain is listed for sale on Afternic.com, which is a

9    third-party Web site.  So there's at least something in the

10   record saying he's listed it there.

11             THE COURT:  Okay.

12             MR. RINEHART:  Those are the references that I'm

13   aware of in the record accompanying this motion, Your Honor.

14             THE COURT:  Okay.  What else?

15             MR. RINEHART:  Are there issues that the Court would

16   like more clarification on?

17             THE COURT:  I don't think so at this time.  Do you

18   need the opportunity to say anything else that you want to say

19   either in support of your motion for summary judgment or in

20   opposition to the defendant's motions?

21             MR. RINEHART:  I don't have any further arguments to

22   advance at this time, Your Honor.

23             THE COURT:  Thank you.

24             Mr. Weslow?

25             MR. WESLOW:  Your Honor, we don't have anything

1    further unless the Court has any questions.

2            THE COURT:  No.  All right.  I'm going to take a

3    recess.  I'll reconvene at 12:30, and I'll make a decision on

4    the pending motions for summary judgment at that time, okay?

5    Thank you, counsel.

6            MR. RINEHART:  Thank you, Your Honor.

7            (Recess from 11:48 a.m., until 12:31 p.m.)

8            THE COURT:  Well, before the Court are the parties'

9    cross-motions for summary judgment in the matter.  Having

10   reviewed the various pleadings that have been filed by all the

11   parties and by the argument that's been presented here today,

12   we have defendant's motion for summary judgment, which is

13   docket No. 122, and plaintiff's cross-motion for summary

14   judgment, that is docket No. 142.

15           First of all, the Court's going to make a finding

16   that the Court does have subject matter jurisdiction over this

17   case.  This is a federal question case, so 28 U.S.C. 1332, it's

18   a claim brought under the Lanham Act.

19           Under 15 U.S.C. 1121, I also find that in rem

20   jurisdiction is proper under 15 U.S.C. 1125(d)(2), and that the

21   registrant resides in Canada and that the plaintiff in this

22   case would not have been able to obtain personal jurisdiction

23   over the registrant in a court in the United States.

24           I also find that venue is proper in this court as the

25   registry for this dot-com domain name is located in the Eastern

66

1    District of Virginia.

2           As to the substantive merits of the various claims,

3    you know, the first issue is whether there is any material fact

4    that is in dispute.  There has to be more than just conclusory

5    allegations, mere speculation, or the existence of the

6    scintilla of evidence.

7           Having reviewed the record and the arguments of

8    counsel, I don't find at this time that there are any material

9    facts that are in dispute.  I think this is -- case is ripe for

10   the decision on summary judgment here today.

11          Plaintiff's amended complaint does assert a claim

12   under the Anticybersquatting Consumer Protection Act, that is,

13   15 U.S.C. 1125(d).  The first element of that statute is that a

14   person must have a bad faith intent to profit from that mark,

15   and that mark referring to the plaintiff's mark, and that's one

16   of the main issues in this case is whether there has been a

17   sufficient showing as to the bad faith intent to profit from

18   the mark.

19          In this case, first as to the registration of the

20   mark, and the statute talks about both registration,

21   trafficking in, or using of a domain name, but as to the domain

22   name was registered in March of 2013, it seems to be

23   undisputed.  The Court finds that at the time of the

24   registration, the plaintiff had failed to present sufficient

25   evidence it could support a finding of bad faith of intent to

1    profit from the plaintiff's mark.

2            I mean, the only evidence that the registrant knew of

3    the plaintiff's mark at the time of registration is a

4    September 4, 2014 e-mail that references an earlier UDRP

5    proceeding.  I think when you look at that letter, it's just

6    mere speculation, that there's no way to look at that e-mail,

7    that it really cannot support a finding of knowledge more than

8    18 months before then, particularly in the fact of the

9    deposition testimony that was given explaining that e-mail and

10   how that e-mail came about, that trying to make an argument

11   that September 4, 2014 e-mail can support a finding of

12   knowledge back in March of 2013 is, is insufficient.

13           So I find that there isn't sufficient evidence to

14   support a finding of bad faith at the time of the registration

15   of the mark.

16           I also find that as of September 4, 2014, going

17   forward, that there was no bad faith intent to profit from this

18   mark.  There has been use of the domain name, and obviously,

19   that's the issue that I'm dealing with now is the use of the

20   domain name.

21           The statute itself sets out a number of nonexclusive

22   factors that are to be considered in making a determination as

23   to whether there is bad faith intent to profit from the mark.

24   I think the parties have agreed that certainly the first two

25   factors, that is, whether the registrant had any trademark

1   rights or whether it is the legal name of the registrant,

2   really are in the favor of the plaintiff in this case, that the

3   registrant didn't have any trademark rights in "myschool."

4          I do find and I think the evidence is clear in this

5   case that the registrant has prior to the filing of this action

6   used the domain name in connection with a bona fide offering of

7   goods and services.  I think, you know, it's clear that as,

8   starting in March of 2013 to the present, it has been using the

9   domain name for the bona fide offering of goods and services,

10  albeit, you know, links and that, but it is using it in

11  commerce, it's obtaining about $700 a month in revenue based on

12  its use of the domain name.

13         You know, I, I think that really is commercial use.

14  It's not noncommercial fair use.  I think when, when -- you

15  know, there hasn't been any real noncommercial use of the mark,

16  that the mark has really been more for commercial purposes

17  given that, so, you know, that's not a factor that I think that

18  comes into play in this case.

19         And I don't find that there's been a showing of any

20  intent to divert consumers from the mark's -- from the mark

21  owner's online location.  There hasn't been any evidence of

22  likelihood of confusion as to the source sponsorship

23  affiliation or endorsement of the site.  There's been no

24  evidence as to what good will, if any, there really is in the

25  use of the mark MYSCHOOL based on the plaintiff's registration

1    and use of the mark, and there's certainly no indication that

2    there's any tarnishment or disparagement of the MYSCHOOL mark,

3    so I don't find that there's been any showing of intent on

4    behalf of the registrant here to divert traffic from what

5    otherwise would have been going to the plaintiff or that

6    there's been any confusion to the source sponsorship, as

7    indicated in factor 5.

8         Factor 6, you know, is unclear, to be honest with

9    you.  The -- this is the offer to transfer, sell, or otherwise

10   assign the domain name to the mark owner or third party for

11   financial gain.  They certainly have used the mark, and so I

12   think that this factor in itself really goes into play in those

13   where someone registers what they deem to be a trademark and

14   then try to sell it to the trademark owner.

15        In this case, that's not that we have here.  We have

16   someone who registered MYSCHOOL.COM, not knowing about the

17   registration of the mark and not then trying to turn it around

18   and sell it without using it.  You've got someone who actually

19   has been using the mark, who's kept the mark, who may be

20   offering it for sale, and that's a little bit unclear as to

21   whether it's, you know, they're actually trying to sell it or

22   whether they're entertaining offers to buy it.  It's not quite

23   clear, so I don't find that is a, a strong factor in either

24   side's favor there.

25        There certainly -- and there's been some argument

1    about misleading and false information.  I don't find that the

2    use of a privacy service is in and of itself false or

3    misleading information.  I think that's pretty customary in the

4    industry now that a lot of registrants use privacy services,

5    and I don't think there's any evidence that shows that the use

6    of that in any way impeded the mark owner's ability to pursue

7    any action.

8            In this case, when he filed the second UDRP

9    proceeding, it was clear that that information was brought to

10   light and the registrant actually came in and dealt with that

11   second UDRP proceeding, so I don't find that factor 7 supports

12   the plaintiff's claim in this case.

13           Clearly, the registrant here has acquired and

14   registered multiple domain names, I mean, thousands, we're

15   talking about maybe 50,000 domain names all total, but, you

16   know, a review of those domain names I don't think strongly --

17   certainly they're not out there -- he's not out there

18   registering famous marks of others, and whether he's

19   registering marks that are distinctive at the time of

20   registration, I think, could be arguable.

21           Certainly as, as the evidence has shown by the

22   exhibit, the summary exhibit that was presented by the

23   plaintiff, there are a number of domain names that have been

24   registered that do have trademarks, but I don't find that as

25   compelling as the plaintiff is arguing here given the nature of

1    the domain names, and, and we went through some of the issues

2    here today as to why that factor may not be as significant in

3    this case as it would be in some others.

4           You know, it's clear that the plaintiff's mark here

5    is not a famous mark.  I don't think there's been any argument

6    as to that, and I, I think it's somewhat of a close call as to

7    whether it really is distinctive, but if it is distinctive,

8    it's only distinctive as to the specific uses that are set out

9    in the registration, and so, you know, I don't find that there

10   is that, a significant strength of the mark argument in factor

11   9.

12          Some other factors that I do take into consideration

13   in making the determination of no bad faith in this case is,

14   you know, the -- and this is from September 2014 going

15   forward -- is that the registrant was aware at that time of an

16   earlier UDRP proceeding that upheld the registration of the

17   domain name by someone other than the trademark owner, and

18   while I understand that decision dealt with the issue of prior

19   registration, it also dealt with some other issues in there

20   that, you know, a fair reading of that decision could lead one

21   to have a reasonable belief that they could continue to use it

22   and that the plaintiff -- and that the registrant in this case

23   did use the mark in its descriptive nature of the due terms and

24   continued to do so and is doing so at the present time.

25          So I find that at the time of the registration and

1   going forward, the registrant did have a reasonable ground to

2   believe that it was fair use of using the mark or otherwise

3   that it was lawful, and that's also another factor taking into

4   consideration that there was no bad faith intent here.

5           So having found there's no bad faith intent, I'm

6   going to grant the defendant's motion for summary judgment.

7   I'm going to deny the plaintiff's motion for summary judgment.

8           I'm not going to delve into the issue of validity in

9   this case.  I mean, I think that's not something that needs to

10  be decided given my finding on the, on the bad faith elements

11  here today as to whether the, there was a sufficient specimen

12  and whether there was sufficient use at the time of, I guess,

13  in 2008, when it went from an intent to use to a use

14  application.

15          Both sides have asked for attorneys' fees in this

16  case.  You know, I've got to say that that's a close call given

17  the recent postings by the plaintiff as to whether I should

18  make a determination of this being an exceptional case and

19  award attorneys' fees to the defendant, but, you know, I'm

20  looking at the case as a whole, not just what happened since

21  September, and I think when the case was originally brought,

22  you know, clearly, the plaintiff had a registered trademark,

23  the domain name is, is a, not a knock-off of the trademark,

24  it's a complete use of that trademark, and that the filing of

25  the case was appropriate, and while some amendments or whatever

73

1  may have been done sooner rather than later in this case, I

2  don't find that the way this case has been litigated, that

3  makes it an exceptional case.

4          Obviously, the defendant will be entitled to the bill

5  of costs as would normally be for a prevailing party but -- so

6  my ruling is that I'm granting the defendant's motion for

7  summary judgment and denying the plaintiff's motion for summary

8  judgment.  We'll get an order entered within the next day or so

9  that will have a judgment entered in favor of the defendant.

10          Okay?  Any questions about the ruling, counsel?

11  Mr. Barnes?

12          MR. BARNES:  No, not from the defendant, Your Honor.

13          THE COURT:  Mr. Rinehart, any questions on the

14  ruling?

15          MR. RINEHART:  No, Your Honor.

16          THE COURT:  Okay.  Thank you.  Court will be

17  adjourned.

18                          (Which were all the proceedings

19                           had at this time.)

20

21              CERTIFICATE OF THE TRANSCRIBER

22      I certify that the foregoing is a correct transcript from

23  the official electronic sound recording of the proceedings in

24  the above-entitled matter.

25          _____
                        /s/
                Anneliese J. Thomson